WILLIAM LEAR, Appellant, *v.* C. H. BISHOP and W. O. BRADLEY, dba C–B RANCH COMPANY, Respond–ents.

No. 6132

October 28, 1970                    476 P.2d 18

[Rehearing denied November 25, 1970]

*Barry & Hall,* of Reno, for Appellant.

*Bradley & Drendel,* of Reno, for Respondents.

## OPINION

By the Court, THOMPSON, J.:

This is an action by C. H. Bishop and W. O. Bradley, dba C–B Ranch Company, seller, to compel William Lear, buyer, to specifically perform an informal contract to purchase land. The district court decreed performance and this appeal followed.

The genesis of this controversy was a friendly deer hunting trip enjoyed by Joseph Frost, the general manager of Lear's Reno Properties, and Frank Groves, Director of the Nevada Department of Fish and Game. They discussed generally the possibility of a land exchange. William Lear, Frost's employer, wished to acquire 360 acres of land owned by the United States near Stead Air Base, Washoe County. The Department of Fish and Game wanted land owned by C–B Ranch Company in White Pine County. The general plan was for Lear and Fish and Game to buy the White Pine land from C–B Ranch after which Lear would exchange the part he had purchased for the Washoe County land, assuming that the latter property would, upon proper application, be classified for exchange purposes. It was not then so classified. Lear's participation in the White Pine purchase was thought to be essential since Fish and Game did not have sufficient funds of its own, and Frost assured Groves that Lear would participate. This preliminary conversation sparked the following occurrences.

On November 12, 1968, the C–B Ranch offered to sell to Fish and Game about 2,640 acres of White Pine land for $300,000. The offer was to remain open until December 15, 1968. Of that amount, $125,000 was to be supplied by Lear and a portion of the land was to be deeded to him for exchange purposes. That such was Lear's purpose is evidenced by an interoffice memorandum dated November 13, 1968 from general manager Frost advising that he had worked out a "complicated interchange whereby you would buy C–B Ranch property and trade it to BLM for 360 acres of land near Stead in Washoe County." Moreover, on November 22, 1968, Frost, on behalf of Lear, met with the president of the Valley Bank of Nevada and requested a loan commitment for $125,000 to purchase 360 acres of government land. His application therefor was accompanied by Lear's personal financial statement, a legal description of the Washoe County property, and maps. Within a week a firm oral commitment to loan Lear that sum was made by the bank.

In reliance upon Lear's participation, the Fish and Game accepted the C–B Ranch offer on December 9, 1968 and Frost, Lear's general manager, was so notified. Eight days later, Frost, on behalf of Lear, wrote the Bureau of Land Management "for the purpose of commencing proceedings looking towards classification and exchange of certain lands in White Pine County to be acquired for certain lands in Washoe County," and requested the Bureau to proceed. By the end of December appraisals of the properties to be exchanged were made and submitted to the BLM.

In consequence of the foregoing an escrow was opened with C–B Ranch as seller and Fish and Game as purchaser. Since time was required for BLM to effectuate the exchange classification which was a condition of Lear's participation, Lear was not made a party to this escrow. Instead, the purchase price was reduced by $125,000 and less acreage was transferred reflecting the exclusion of the land Lear was to receive. The C–B Ranch-Fish and Game escrow was consummated and closed on January 2, 1969.

On the following day two new escrows were opened to conclude the balance of the transaction. The first, between C–B Ranch and Lear, and the second, between Lear and the BLM. In the first escrow the C–B Ranch deposited its deed to Lear for the balance of the White Pine property excluded from the sale to Fish and Game. The instructions for the C–B Ranch-Lear escrow were prepared by Lear's attorney after conferences with general manager Frost, submitted to W. O. Bradley

of the C–B Ranch and signed by him. Lear thereafter declined to sign.

Subsequently, the state director of the BLM issued his proposed decision to classify the Washoe County property for exchange purposes, subject to formal application therefor by Lear. Lear never submitted such application. Hence, this law suit.

The several transactions to which we have referred were undertaken in reliance upon the representations of Lear's general manager that Lear would participate in acquiring the C–B Ranch lands. At least the trial court so found, and substantial evidence supports that finding. All commitments, the Fish and Game to C–B Ranch, C–B Ranch to Fish and Game and to Lear, the Valley Bank to Lear, and the proposed decision of the Bureau of Land Management to classify the Washoe County land for exchange purposes, were made at the request of Lear's general manager and in reliance upon his authority to act for Lear and to bind him. There is not the slightest suggestion that Lear would not complete the bargain, until the final moment when his signature was sought and others had already altered their positions upon the assumption that it would be forthcoming.

Notwithstanding these circumstances, the appellant-Lear contends that neither he, nor anyone on his behalf contracted with the C–B Ranch, orally or in writing. He points to the acknowledged fact that his general manager Frost never conversed with either partner of the C–B Ranch until after the Ranch had sold a portion of its lands to Fish and Game. In short, he acknowledges his general intention to participate in the transaction but disavows a binding commitment to do so. He argues that his general manager was without authority to bind him; that if an oral commitment was made by his manager the statute of frauds precludes relief; and, in any event, specific performance cannot be decreed within the context of this case. We turn to resolve these issues.

1.   We reject out-of-hand the contention that Lear's general manager was without authority to bind him. The record shows that Lear has vast property holdings and many business enterprises. Commercial convenience requires him to act through representatives with authority to conduct his affairs. The dealings of Frost were incidental to his position as general manager of Lear's Reno Properties and were relied upon in good faith. In these circumstances Lear, as a disclosed principal, is liable for acts done by his general agent on his account. Rest.

Agency 2d, § 161 (1957);[1] Hartley v. United Mine Workers, 113 A.2d 239 (Pa. 1955).

2. Equally without substance is the contention that the statute of frauds bars relief. NRS 111.210 voids every contract for the sale of land unless "the contract, or some note or memorandum thereof, expressing the consideration, be in writing, and be subscribed by the party . . . by whom the sale is to be made." The informal contract concerning the C–B Ranch sale of some of the White Pine land to Lear was memorialized by escrow instructions prepared by Lear's attorney at the direction of Lear's general manager. Indeed, the initial instructions prepared by the title company were not in acceptable form to Lear. His counsel revised them per direction and submitted them to the seller who signed without objection. All essential terms were expressed with certainty. The requirements of the statute of frauds were met in every respect.

3. Lear urges that specific performance should not have been decreed since his participation was contingent upon classification of the Washoe County land for exchange purposes, a contingency over which he had no control. Kowalchuk v. Hall, 80 Nev. 3, 388 P.2d 201 (1964). Had the State Director of the Bureau of Land Management ruled that the Washoe County land was not suitable for exchange classification, this contention would carry weight. However, he ruled to the contrary. His proposed decision was to classify the Washoe County land in accordance with Lear's request. Final processing required Lear to submit a formal application which he declined to do. The record may be read to show that Lear's refusal to so apply frustrated classification. Thus, we conclude that the agreed exchange may be guaranteed with substantial certainty to both parties and specific performance is not outlawed as an appropriate remedy. Harmon v. Tanner Motor Tours, 79 Nev. 4, 19, 377 P.2d 622 (1963).

4. The oral promise of Lear's general manager to participate in the purchase of the White Pine land owned by C–B

---

[1]Section 161 reads: "A general agent for a disclosed or partially disclosed principal subjects his principal to liability for acts done on his account which usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by the principal, the other party reasonably believes that the agent is authorized to do them and has no notice that he is not so authorized."

Ranch was made to Fish and Game for its benefit and for the benefit of C–B Ranch as well. The C–B Ranch was made aware of that promise, relied upon it and changed its position by severing its ranch property. Reliance by the Ranch was foreseeable and reasonable. Cf. American Savings & Loan v. Stanton-Cudahy, 85 Nev. 350, 455 P.2d 39 (1969); Rest. Contracts § 90 (1932). Although the doctrine or promissory estoppel expressed in Section 90 and applied in American Savings, supra, is limited to cases in which the action in reliance is on the part of the promisee (Fish and Game), an intended third party beneficiary (C–B Ranch) should similarly be protected if its reliance was likewise foreseeable. Vol. 1A, Corbin on Contracts § 200, p. 219; Burgess v. California Mutual Bldg. and Loan Ass'n, 290 P. 1029 (Cal. 1930). Here, the terms of Lear's participation were eventually memorialized by escrow instructions prepared by Lear's counsel and accepted by the C–B Ranch. An injustice can be avoided only by forcing Lear to honor the promise of his general manager.

Affirmed.

COLLINS, C. J., ZENOFF, BATJER, and MOWBRAY, JJ., concur.