### In re GOLCONDA FARMS, a Partnership, Debtor.

### Bankruptcy No. 80–00341.

United States Bankruptcy Court, D. Nevada.

July 29, 1981.

Lionel, Sawyer & Collins by Richard W. Horton, Reno, Nev., for debtor.

Stephen R. Harris, Reno, Nev., for trustee.

Henderson, Nelson & Moschetti by John Martz, Reno, Nev., for trustee for Golden H Packing Co.

Vargas & Bartlett by John C. Renshaw, Reno, Nev., for J. R. Simplot Co.

Guild, Hagen & Clark, Ltd. by David W. Hagen, Reno, Nev., for Nevada Nat. Bank.

Margaret Ann Glodowski, Reno, Nev., for Sierra Pac. Power.

## OPINION AND DECISION ON TRUSTEE'S APPLICATION FOR PAYMENT OF AUCTION PROCEEDS

BERT GOLDWATER, Bankruptcy Judge.

Prior to the order for relief on June 3, 1980, the trustee in bankruptcy for Golconda Farms (Golconda) was a state court receiver. During that time he auctioned equipment and vehicles as well as 1979 crops. The trustee now holds money from the auction as to the equipment and vehicles (approximately $1,000,000) and the crops (approximately $500,000). Some accounts receivable from 1979 crop sales, other than from the auction, will add to the crop account when collected.

All of the funds are subject to an unresolved lien claim of the Internal Revenue Service (IRS). The trustee has applied to distribute the funds up to the amount of the IRS lien.

An agreement was reached between Nevada National Bank (NNB) and the trustee in bankruptcy for Golden H Packing Company (GHP), a partnership, that the former receive 51% and the latter 49% should either be found to have priority.

The claims among NNB, GHP, J. R. Simplot Co. (Simplot), and Sierra Pacific Power (Sierra) are in conflict as to the 1979 crop proceeds.

Prior to the formation of a partnership with GHP known as Golconda, LaVar Murdock operated farms in Humboldt County, Nevada, with financing from NNB. In the latter part of 1977, NNB refused to further finance Murdock because of his defaults and told him that he would have to obtain new capital or be liquidated. Prior to that time, NNB had security agreements on farm products of Murdock for each year for the years 1975, 1976, and 1977.[1]

Murdock obtained preliminary financing for 1978 in April from GHP looking towards selling GHP one-half interest in Murdock Farms and a partnership. GHP obtained security agreements on all farm products from Murdock on April 6, 1978. GHP and Murdock agreed to buy and sell and become partners doing business as Golconda Farms as of April 10, 1978.[2] GHP insisted it could not bear the entire cost of financing the 1978 Golconda crop. The sale closing, with formation of the partnership, included a loan from NNB to the newly formed Golconda for $1,200,000 (Exhibit 37) with subordination by GHP of its April 1978 security agreement to the extent of 51% in favor of NNB. On September 8, 1978, Golconda gave NNB a security agreement on all farm products. In January 1979, NNB again received a security agreement from Golconda for farm products (Exhibits 86 and 87).

At all times NNB refused financing for the 1979 Golconda crops. The situation became critical for Golconda in April 1979. Money was obtained from Haddad Farms, Inc., (Haddad) to finance lease payments and the 1979 crop after an inquiry by Haddad's attorney as to whether or not NNB had a "security interest". NNB stated verbally and by letter[3] that (1) NNB had no interest in financing a 1979 operating loan for Golconda Farms, (2) NNB held *"no security interest in 1979 crops or farm prod-*

---

1. All references herein to security agreements include financing statements and perfection as required by law.

2. Many documents were signed September 8, 1978 and the escrow finally closed in December 1978.

3. The letter was written by NNB but never received by Haddad's lawyer.

ucts", but (3) "we *do have a security interest* in the *proceeds* of crops and products" (emphasis added) (Exhibit 90).

For many years Murdock had purchased chemicals and fertilizers from Simplot on open account. In the spring of 1979, Simplot officers met with Golconda principals concerning the delinquent account and the future payment of Golconda's bills. About June 5, 1979, Golconda signed a note dated June 1, 1979 for $247,792.77 in favor of Simplot. This was a balance struck by Simplot in which it had given $125,000 credit on Murdock's old bills. The note covered purchases both before and after Golconda was formed. GHP claims the note should be only for Golconda's debt for the 1978 crop with credit of $125,000.[4]

If there is an issue as to the proper amount of the promissory note, it is a matter for Golconda's trustee to object.

At the time the promissory note was signed, Simplot also refused further credit to Golconda without security. Simplot's Winnemucca representative found the financing records showed NNB had a September 1978 filing and Haddad had an April 1979 filing. On June 11, 1979, an agreement letter, drawn by Simplot, was executed. It provided Simplot would furnish all chemicals and fertilizers for the 1979 crop on credit after June 1, 1979. The promissory note was not mentioned and the agreement by its terms excluded any statement, promise or inducement not contained in the agreement. Golconda was to grant Simplot a security interest in crops. Haddad was to subordinate its security interest in grain crops.

Simplot did not find the NNB 1979 filing.[5] Simplot made its decision to advance credit believing it would "come ahead of everybody but A. G. Haddad". 2 *Transcript of Proceeding* 206 (May 13, 1981).

On November 13, 1979, Golconda signed a security agreement in favor of Sierra to which GHP subordinated.

A subordination may be oral or by letter. The formality of a subordination filing is not necessary. N.R.S. 104.9316 provides:

Nothing in this article prevents subordination by agreement by any person entitled to priority.

See *Williams v. First National Bank and Trust Co. of Vinta*, 482 P.2d 595 (Okl.1971); *Kirkpatrick v. Oil Well Supply Co.*, 172 Okl. 248, 49 P.2d 712 (1935).

There was a conflict in the testimony of the NNB officer and Haddad's counsel as to what was said and understood. In any event, whether NNB subordinated to Haddad in response to the inquiry from Haddad's counsel is now moot.[6]

There is really only one issue here: Does Simplot have a priority position over NNB as to 1979 Golconda crop proceeds? The answer is no.

NNB was on record in September 1978 with a subordination as to 49% to GHP. On January 22, 1979, Golconda executed a security agreement in favor of NNB of crops and all after-acquired property of the same description.[7]

4. While Golconda was in its formative stage in April 1978, GHP sent $25,000 to Murdock and later, in September 1978, an additional $100,-000 was given to Murdock from the NNB loan. Murdock sent both sums to Simplot which did not credit the amounts to the 1978 crop expense but against Murdock's delinquent account.

The certified public accountant who was to make up the Golconda accounting "as of April 10, 1978" according to the sale agreement of September 8, 1978, testified that Golconda was to pay all of Murdock's debts and Murdock would then owe the Golconda partnership an account receivable. Tom Haddad, partner in GHP, testified that the funds were forwarded by GHP strictly in accordance with its agreement to fund only the 1978 crop expenses of Golconda.

5. NNB had filed January 22, 1979 covering all after-acquired crops (see Exhibits 86 and 87).

6. Haddad was also marketing agent by agreement with Golconda and retained sales proceeds to repay itself in full.

7. Filing or perfection as to collateral includes proceeds. N.R.S. 104.9312.6. Proceeds include what is received upon the sale of collateral. N.R.S. 104.9306.1. A security interest may attach to after-acquired property such as crops to be grown. N.R.S. 104.9203, 104.9204.

Simplot's decision as to its security interest position was made the way "business was conducted in this industry" (2 *Transcript of Proceedings* 217 [June 2, 1981]). The witness Johnson made it eminently clear that Simplot did not consider NNB filings in September 1978 to be effective because of the "New Money versus Old Money rule" (*id.* at 215). This is the rule of the official Uniform Commercial Code, Section 9–312, subparagraph (2):

> (2) A perfected security interest in crops for new value given to enable the debtor to produce the crops during the production season and given not more than three months before the crops become growing crops by planting or otherwise takes priority over an earlier perfected security interest to the extent that such earlier interest secures obligations due more than six months before the crops become growing crops by planting or otherwise, even though the person giving new value had knowledge of the earlier security interest.

Simplot, an Idaho Company, was probably under the impression that it would be taking a super priority for new value to produce the 1979 crop because Idaho law adopts the official Uniform Commercial Code [28–9–312(2) Idaho Code].

Unfortunately for Simplot, Nevada did not adopt subparagraph 2. *See* N.R.S. 104.-9312 ("2. [There is no subsection 2.]").[8] In Nevada, first in time controls. N.R.S. 104.-9312.5(a).

Although Simplot's chief witness testified that Simplot relied upon the record of filings,[9] its brief contends that it is entitled to priority because NNB is estopped by its course of dealing. Now, in hindsight Simplot points out conduct of NNB which might be inconsistent with its present position, such as its communication to Haddad's lawyer (Exhibit 90, *supra*).

In *Lear v. Bishop*, 86 Nev. 709, 476 P.2d 18 (1970), an oral promise was made by the ranch manager for Lear to acquire and exchange certain land. The promise was made to Fish and Game and included an exchange of land with C–B Ranch. While the promise was not made to the C–B Ranch, the latter was made aware of the promise, relied upon the promise and changed its position. The Supreme Court said (at 714 of 86 Nev., 476 P.2d 18):

> Although the doctrine of promissory estoppel expressed in Section 90 (of the Restatement of Contracts) and applied in *American Savings*, supra, (85 Nev. 350, 455 P.2d 39 (1969)) is limited to cases in which the action in reliance is on the part of the promisee (Fish and Game), *an intended third party beneficiary* (C–B Ranch) *should similarly be protected if its reliance was likewise forseeable.* Vol. 1A Corbin on Contracts § 200, p. 219; *Burgess v. California Mutual Bldg. and Loan Ass'n* [210 Cal. 180], 290 P. 1029 (Cal. 1930). Here, the terms of Lear's participation were eventually memorialized by escrow instructions prepared by Lear's counsel and accepted by C–B Ranch. An injustice can be avoided only by forcing Lear to honor the promise of his general manager. (Emphasis added.)

The testimony in this case is that Haddad told Simplot that he had a first position [Transcript (June 2, 1981) supra at 216] Simplot did not know of NNB's communication to Haddad's lawyer and made no inquiry of NNB. It relied upon a misunderstanding of Nevada law, a failure to note a NNB 1979 Uniform Commercial Code filing and conversation with Haddad.

Simplot did not rely upon NNB's course of dealing. It was not a party to NNB's response to Haddad's lawyer. NNB did not clearly and unequivocally release its priority position. Its talk of "releasing the collateral" but *not* the proceeds does not constitute an absolute release even if it were

---

8. 1967 Minutes of Nevada Assembly Judiciary Committee, April 5, 1967, pages 332, 335 re SB 488 (Exhibit 114).

9. The witness testified that had Simplot known of NNB's January 22, 1979 filing it would have been very reluctant to consider that it could take a priority position. *Transcript* (June 2, 1981) *supra* at 243–244.

communicated to Simplot. If NNB should be held to foresee the effect of its statement, it could only be held to foresee that someone would understand that it retained a security interest of some kind. If, prior to filing, Simplot had been given a copy of NNB's letter it would be on notice as surely as if it had found and seen the January 22, 1979 filing that NNB claimed a security interest in the proceeds of the 1979 crop.

NNB knew or should have known that Golconda needed fresh money to continue its 1979 crop but NNB could not be expected to know that Simplot was changing its position from open account to secured creditor based upon a conversation between Haddad and NNB. To so hold would subvert the entire purpose of the Uniform Commercial Code and ignore the fact that at all times NNB was on record and later confirmed by letter a claim of security interest in proceeds.

NNB is entitled to priority of the crop proceeds as against Simplot. Sierra filed a position paper but did not participate in the trial of the issue among GHP, NNB, and Simplot. Sierra reserved its right to assert its priority and that matter must now be set for hearing unless resolved among counsel for the interested parties.