Steven DAVIS, et al.,
Plaintiffs/Respondents,

v.

Richard T. NELSON, et al.,
Defendants/Appellants.

No. 64079.

Missouri Court of Appeals,
Eastern District,
Division Four.

Aug. 9, 1994.

---

Terrance J. Good, Nelson G. Wolff, Carolyn M. Kopsky, St. Louis, for appellants.

Louis F. Bonacorsi, Ketrina G. Bakewell, Thomas E. Wack, Peter W. Herzog, III, St. Louis, for respondents.

GRIMM, Presiding Judge.

In this bench trial, plaintiff[1] sought (1) to compel defendant[2] to specifically perform an agreement they made to terminate a condominium agreement and (2) to establish a fee simple ownership of the two condo units. Also, he sought to terminate any interest defendant has in an adjoining lot.

On the other hand, defendant contended the termination would create an illegal subdivision. Further, he sought unlimited access to an expanded driveway and garden on the adjoining lot.

---

1. Steven L. Davis as trustee, and Wallace R. Persons as beneficiary, of the Clayton–Bemiston Property Trust are the plaintiffs. For ease of reading, unless otherwise indicated, we refer to them in the singular.

2. Richard T. Nelson, individually and as trustee and beneficiary of the RTN '87 Trust, is the defendant.

The trial court found for plaintiff. It ordered defendant "to execute the documents necessary to effectuate the termination of any existing condominium plan involving [the two units] and to establish fee simple ownership of [the units] with a party wall and access easement. . . ." Further, it ordered defendant to execute any "required Application for Variance as required by local zoning authorities." Finally, it quieted title to the adjoining lot in plaintiff, "free from and unencumbered by any claim of anyone else as to the unrestricted and unlimited use of the [adjoining lot], particularly Defendant."

Defendant appeals, raising three points. First, he alleges the trial court erred in finding that defendant did not have an easement for the driveway on the adjoining lot. Second, he asserts that the trial court erred in denying his counterclaim based on quantum meruit. Finally, he contends there is no writing sufficient to satisfy the statute of frauds. We affirm the trial court's judgment.

## I. Background

### A.

We state the facts in a light most favorable to the judgment. In early 1987, Developer executed a declaration of condominium for Bemiston Place Condominium. Two phases were projected, with two units to be built in each phase. However, only the first phase was formalized.

In the first phase, Developer sold the front unit, which faces Bemiston, to plaintiff. He sold the other unit, which is behind, but attached to plaintiff's unit, to defendant. At the time of each sale, Developer represented that the second phase would be completed.

The second phase called for Developer to build a mirror image of these two units on an adjoining lot. A common driveway, including a turn-around area, would provide access from Bemiston to all four units. The phase was not begun.

### B.

Both parties experienced construction problems with their units. Further, they became concerned that Developer would not complete the project as planned. For example, he had not removed the house on the adjoining lot, much less commenced construction of the other units.

To remedy these problems with Developer, plaintiff hired an attorney. From about July, 1988, through May, 1989, Attorney conducted numerous discussions with Developer and his lawyer. He offered several proposals in an attempt to induce Developer to complete the second phase, none of which materialized.

In October, 1988, Attorney drafted three documents. They were:

1. Settlement Agreement between plaintiff and Developer to resolve all construction disputes between those two parties.

2. Agreement to Terminate Condominium and Convey Common Elements to be signed by Developer, plaintiff, and defendant. This document provided for the termination of the condominium; however, among other things, it was subject to City of Clayton approval.

3. Party Wall and Access Easement Agreement to be signed by plaintiff and defendant. It recognizes that each party holds fee simple title to their respective properties, and that a party wall separates them.

On October 27, 1988, these three documents were sent to defendant. The transmittal letter pointed out that there was a "six-month delay period before the termination takes effect." This was to guard against the possibility that the City of Clayton would not approve the change. In such a situation, plaintiff and defendant would "be left with a terminated condominium but no fee simple title."

These documents were never executed. Further discussion ensued between Attorney and Developer. In March, 1989, Attorney drafted an amended Settlement Agreement. This proposal permitted Developer to build a single dwelling unit on the adjoining lot. However, it required Developer to build the swimming pool originally called for by the plans, as well as an expanded driveway. Developer was to commence work by July 1,

1989, otherwise, plaintiff could exercise an option to purchase the adjoining lot.

On March 16, 1989, defendant wrote a letter to plaintiff. In that letter, reference is made to Developer's proposal of a single-family dwelling on the adjoining lot. More importantly, we note that defendant's letter indicates his preference that the parties "have a simple condominium agreement along the lines you and I discussed."

On March 28, 1989, Attorney sent defendant copies of the proposed settlement agreements with Developer. On March 31, defendant and Attorney discussed the draft documents. Defendant told Attorney that the Party Wall and Access Easement Agreement were "okay as is."

Further, defendant said he no longer preferred a condominium agreement on the two units. Rather, he agreed to the termination of the condominium. Changes in the proposed Agreement to Terminate Condominium and Convey Common Elements were discussed, and defendant indicated a willingness to sign the Agreement.

Also, either in that conversation or another, Attorney told defendant that plaintiff would not proceed to work out the problems with Developer unless the existing condominium arrangement with the parties two units was terminated. Defendant "consistently indicated his agreement to that termination."

On April 6 or 7, 1989, Attorney met with defendant. At that time, all of the documents were discussed. Attorney told defendant that the changes defendant requested would be made. Defendant told Attorney that if those changes were made, "he'd be prepared to sign them and move forward."

Thereafter, the deal with Developer began to change. In late April, some changes were made in the documents. These were sent to defendant. However, Developer again failed to comply.

On May 1, 1989, in an attempt to end negotiations, plaintiff contracted with Developer[3] for the purchase of the adjoining lot

for $225,000. This contract contained the following special agreement:

> [Developer's] obligation to close hereunder is contingent upon [Developer's] receipt, on or before closing, of a release by [defendant] from any and all liabilities or obligations in respect of the rehabilitation and construction of the property to be conveyed to [plaintiff] hereunder (as part of or in connection with) the condominium project comprising [plaintiff's] property, such release to be mutually satisfactory to [Developer] and [defendant].

By letter dated May 2, 1989, plaintiff advised defendant that he planned to purchase the adjoining lot. Plaintiff currently planned "to clear it and have a vacant lot." Plaintiff told defendant that his purchase was "subject to a release signed by you which only excuses [Developer] from redoing [adjoining lot] but which keeps your other claims available." Plaintiff asked defendant to contact Attorney to make arrangements to sign the release.

On the morning of May 3, 1989, Attorney and defendant had a phone conversation. At that time, Attorney read the driveway turnaround proviso to defendant, which says: "provided further, that the [defendant's] Property driveway turnaround shall not be reduced in size."

Attorney explained to defendant that they were not going to reduce the driveway, that he was going to get six feet. "And the reason [plaintiff was] going to give you six feet is [that plaintiff] has a fifty foot lot with two six foot setbacks on each side of the lot line, so we have very little to work with now." Defendant "indicated to [Attorney] he understood all of that and that was just fine with him." Further, Attorney said no representations were made as to how long the adjoining lot would be kept vacant or whether it would be developed.

That afternoon, Attorney met with defendant. It is unclear where this meeting occurred and exactly who was present. Defendant says plaintiff attended and asked him if he wanted to join him in purchasing this property. Defendant made it clear that he

---

**3.** The adjoining lot was actually owned by Developer's mother-in-law and the contract was with

her. However, for ease of reading, we attribute ownership to Developer.

had no interest in paying for half or any part of the adjoining property.

Attorney gave defendant a copy of the release and consent; they "talked about what it said, what its effect was," and that they were going to terminate the condominium agreement. At the conclusion of their meeting, defendant took the release and consent with him. Later that day, defendant and his wife signed the document.

In the document, defendant and his wife released Developer and plaintiff

> from any and all liabilities or obligations in respect of the rehabilitation and construction of [adjoining lot] as part of or in connection with the rehabilitation and construction of the condominium project of which [defendant's] property is a part.

> [Defendant and his wife] further consents [1] to the sale of the [adjoining lot] and to any resale thereof, [2] to the release of the [adjoining lot] from the lien of the Condominium Declaration, if any, [3] to the demolition of the improvements thereon, [4] to the related clearance and landscaping thereof, and [5] to any future development of the [adjoining lot], whether as an expansion of the Condominium or as a separate development, or both, ... *provided further, that the [defendant's] Property driveway turnaround shall not be reduced in size.* Accordingly, [defendant and his wife] hereby ... forever quitclaims unto the owner of the [adjoining lot], and its successors and assigns, all right, title and interest ... in the adjoining lot.

(Emphasis added.)

The parties agree that the driveway has always encroached on the adjoining lot. Plaintiff's evidence would support a finding of only a three foot encroachment. However, plaintiff acknowledges that at the time the Release and Consent were signed, he represented to defendant that there would be a six foot encroachment.

Also on May 3, 1989, defendant wrote plaintiff a letter. This letter confirmed a conversation in which defendant offered to have a landscape architect prepare a plan for the adjoining lot. The plan would create "a desirable entry drive and turn around area,

as well as enable us to enjoy the area as a special private 'garden park'." Defendant would pay the entire cost as a "small way to say 'thanks' for [plaintiff's] efforts."

That summer, plaintiff closed the purchase of the adjoining lot. Also, that summer and fall, defendant developed a garden on it. He spent approximately $38,000 on the garden.

As the garden was being developed, the parties agreed to build a wider driveway and turnaround. This encroached even further onto the adjoining lot. They shared this cost of $8,600 equally.

On August 30, 1989, Attorney wrote defendant. Among other things, Attorney said that it was his intention "in the near future to draft appropriate documents terminating the condominium arrangement and replacing it with a party wall agreement governing the common wall between" the two units. After the draft was prepared, Attorney said he would send it "for your review and the review of your attorney."

On September 1, 1989, defendant replied to this letter. Defendant wrote that he looked forward "to the documents terminating the condominium agreement and replacing it with the party wall agreement."

Almost a year passed before the next communication occurred. On August 15, 1990, plaintiff wrote the City of Clayton requesting approval to subdivide the two units and to create two fee simple townhouses. The next day, the City denied the request. The denial letter set forth two reasons: (1) The minimum lot size is 5,000 square feet, and these lots would be substantially less; and (2) a building lot must front a street or public place and defendant's lot would not do so.

Attorney sent defendant a zoning variance application. Defendant called Attorney and told him that he wanted his attorney to review it, however his attorney was on vacation.

On August 28, 1990, defendant's attorney called Attorney. In that conversation, defendant's attorney said that he did not want the encroachment as it existed diminished. Attorney said that they would allow an encroachment up to the six foot setback line, but that was the limit. Defendant's attorney

did not dispute this. Further, defendant's attorney asked that Attorney send him copies of various documents.

On October 5, 1990, Attorney sent the requested documents. He said these documents were essentially the same as those given defendant in 1989 except references to Developer had been deleted. Attorney asked that the agreements be executed so he could proceed with the zoning variance application.

On October 16, 1990, defendant's attorney responded to the October 5 letter. His letter stated that he had not been able to talk with defendant because defendant's son had been killed in an automobile accident. However, he asked that Attorney furnish him with several documents and raised questions on other issues.

Attorney thought he would hear something more from defendant's attorney, so he did not respond. Finally, in March, 1991, Attorney wrote defendant's attorney. Defendant received a copy and responded to both his attorney and Attorney. He said that although he had originally suggested two years ago to change the units from condominium to fee simple, he no longer thought this is a worthwhile idea.

Defendant gave several reasons. First, he had been told that it would be difficult to obtain marketable title to his unit. Second, real estate agents told him such action would adversely affect the value of his unit. Third, he understood there would be a problem in obtaining a zoning variance. Finally, he did not see any benefit, as the present arrangement seemed to work fine.

Thereafter, relations between the parties deteriorated. Ultimately, this action was filed.

## II. Claim of Easement

In his first point, defendant alleges the "trial court erred in finding that there was no driveway/turnaround easement across the [adjoining] property because an easement was created expressly, impliedly and by estoppel." The point contains three subpoints or arguments.

■ First, defendant argues that the "condominium declaration expressly provides for a driveway/turnaround easement across the [adjoining] property." Second, he contends that "an implied easement exists because the plan and intent of the developer, as understood and agreed by [defendant and plaintiff], was to grant an easement over the [adjoining] property in favor of each unit holder." Finally, he alleges that his "material expenditure of money and labor to secure the enjoyment of his use of the driveway/turnaround created an easement by estoppel."

Defendant's first two arguments miss the mark. It appears that the original Phase I and II plans and documents contemplated granting each condominium owner an easement for ingress and egress to and from their respective units. The site plan, attached to defendant's purchase agreement, depicts a driveway turnaround located on both the adjoining lot and the lot occupied by plaintiff and defendant. The original condominium plans were dependent upon successful completion of the Phase II development.

However, because of a running dispute with Developer, the Phase II development never occurred. In an attempt to settle this dispute, plaintiff purchased the adjoining lot. Defendant consented to this purchase. As part of the purchase, defendant executed a Release and Consent. This released Developer and plaintiff from any obligation to develop the adjoining lot pursuant to the phase II plans.

In addition, defendant expressly released any claim of right in the adjoining property. Specifically, the release stated:

> the undersigned hereby remises, releases and forever quitclaims unto [plaintiff], *all right, title and interest of the undersigned in and to the [adjoining] property.*

At trial, defendant testified that he had read the release "from beginning to end," and that he understood that he was "releasing the [adjoining] property from the lien of condominium declaration." Consequently, defendant cannot now claim an easement over the entire driveway/turnaround which encroaches upon the adjoining lot from plans and docu-

ments that were executed prior to this release.

However, the release also contained a condition, which stated that the "driveway turnaround shall not be reduced in size." When the parties purchased their units and at the time the release was executed, the "driveway turnaround" encroached onto the adjoining lot approximately six feet.

At trial, both the trustee and beneficiary of the trust which owns plaintiff's property testified that defendant was entitled to an easement in the driveway. Beneficiary said that "there has always been an understanding between [defendant] and myself that he would have an easement in the driveway." Trustee testified that in discussing the release and consent with defendant, he told defendant that "we're going to give you six feet."

Thus, plaintiff acknowledges that defendant is entitled to a six foot driveway/turnaround easement on the adjoining lot. This easement would commence on North Bemiston Avenue and run westwardly parallel to the south line of the parties' property approximately 105 feet to the west end of the driveway.

■ We turn to defendant's third argument, that his payment for a portion of the expanded driveway/turnaround created an easement by estoppel. Defendant argues that equity courts may apply equitable estoppel in situations where a licensee made a material expenditure of money. *Hermann v. Lynnbrook Land Co.*, 806 S.W.2d 128 (Mo. App.E.D.1991). In such a situation, however, a court is not required to impose an easement. Rather, the parties' rights should "be severed, if at all, on equitable principles." *Id.*

Here, defendant paid about $4,300 for one-half of the cost of improving and expanding the driveway/turnaround. He received a six foot easement over the adjoining lot for a driveway/turnaround.

In contrast, plaintiff not only paid the other one-half, he also purchased the adjoining lot, paid all the legal fees leading to its acquisition, demolished the building, and cleared and levelled the lot. These expenses exceed $250,000.

In addition, the trial court, sitting as an equitable court, could consider the ramifications of giving defendant an easement of approximately 16 feet. The adjoining lot is only 50 feet wide. If defendant had a 16 foot easement, it would be difficult, if not impossible, for the adjoining lot to be developed. We cannot say that the trial court erred as a matter of law in denying a 16 foot easement to defendant.

Subject to the clarification that defendant has a six foot easement as above described, defendant's first point is denied.

### III. Quantum Meruit

In his second point, defendant alleges the "trial court erred in entering judgment against [defendant] on his counterclaim for quantum meruit because[: 1] defendant provided [landscaping, an expanded driveway/turnaround, supplies and labor] to the plaintiff with [his] knowledge and assent, [2] plaintiff received a material benefit from those services and materials, and [3] plaintiff refused to reimburse [defendant] the reasonable value of the services and materials."

### A. Landscaping

■ First, we examine defendant's claim of quantum meruit for the landscaping improvements. "Quantum meruit is a remedy for the enforcement of a quasi-contractual obligation and is generally based on the principle of unjust enrichment." *Archway Kitchen & Bath, Inc. v. Lands Dev. Corp.*, 838 S.W.2d 13, 14 (Mo.App.E.D.1992). "Unjust enrichment occurs when a person retains and enjoys the benefit conferred upon him without paying its reasonable value." *Id.*

■ However, "when a party voluntarily does an act or renders service and there is no intention at the time that he should charge therefore or understanding that the other should pay, he will not be permitted to recover, for that which was originally intended as a gratuity cannot subsequently be turned into a charge." *Lewis v. Thompson*, 231 Mo.App. 321, 96 S.W.2d 938, 942 (1936);

*see also Keeshan v. Embassy Investment Co.,* 303 S.W.2d 666, 672 (Mo.App.E.D.1957).

Here, the record reveals that defendant's landscaping improvements were intended as a gift to plaintiff. First, on May 3, 1989, defendant and his wife wrote plaintiff offering to landscape the adjoining property. This letter stated:

we look forward to really enjoying this project and hope you ... will likewise. After all the [turmoil], *we felt this was a small way to say "thanks" for your efforts.*

(Emphasis added).

Second, on September 1, 1989, in a letter to Attorney, defendant stated that he *"volunteered to pay* for all other costs associated with our garden as outlined in my 5/3/89 letter...."* (Emphasis added). Further, at trial, defendant testified that the garden was: "intended to be gracious," "a small way to say thanks," and "nothing more than a gentlemanly effort to be a good neighbor."

In his brief, defendant states that "although [he] did not initially request payment for the ... improvements, he completed [them] in reliance on [plaintiff's] representation that he would not develop the [adjoining] property and that he would allow [defendant] unlimited and unrestricted use of the [adjoining] property so long as [plaintiff]" lived in his unit. At trial, plaintiff denied making any representation to leave the lot undeveloped or vacant. Also, he denied ever telling defendant that he would be allowed unrestricted access to the adjoining property.

■ "In court-tried cases conflicts in evidence are for the trial court to resolve and we take the facts in accordance with the results there reached." *Matter of Estate of Bollier,* 684 S.W.2d 67, 69 (Mo.App.E.D. 1984). Here, the trial court denied defendant's claim for quantum meruit. In so doing, it necessarily believed plaintiff's evidence. We find no error.

### B. Driveway/Turnaround

■ Next, we examine defendant's claim of quantum meruit for the driveway/turnaround expenditures. Again, the record reveals that defendant did not originally intend to seek reimbursement from plaintiff for the driveway/turnaround expenditures. Specifically, on September 1, 1989, defendant wrote a letter to Attorney. It provided, in part:

The work on the driveway should commence shortly. As you know, [plaintiff] has requested, and I have concurred with, digging up the driveway as necessary to install drains from the downspouts as specified on the plan, *as well concurred with* expanding the driveway as he has requested. On–Site Construction Co. Inc. has been contracted by me to do it for $8,163. *I have suggested that [plaintiff] and I split this common driveway related cost 50/50.*

(Emphasis added).

The record shows that in accordance with their original intentions, this driveway/turnaround cost was split evenly by the parties. As a result, defendant cannot now seek reimbursement for his expenditures. Point denied.

### IV. Termination of Condominium Status

In his third point, defendant alleges the "trial court erred in ordering [him] to execute real estate documents terminating the existing condominium plan because [he] never agreed to do so." Also, he contends that "even if there was an oral agreement ..., such an agreement would violate the Statute of Frauds."

### A. Existence of Agreement

■ At trial, defendant denied ever agreeing to terminate the condominium status of the parties' two units. Instead, he stated that he was interested in only finding out about the pros and cons of such an agreement.

In contrast, Attorney testified that he did *not recall* defendant ever making such an inquiry. Instead, Attorney stated that he sent defendant the termination documents which "clearly stated" that the condominium status would be terminated.

Also, Attorney said:

[Defendant] had read them and called or spoken to me and told me that he understood them, and I certainly explained to him that ... [t]ermination of a condomini-

um agreement would take [the two units and adjoining lot] and put them all as fee simple units, and that the party wall and access easement agreement would be the document that would set forth the ground rules for the relationship between [the two units].

In addition, Attorney stated that defendant "was indicating to me on a regular basis that he was willing to sign the documents, that he agreed to the terms of the documents, and in fact was making his own suggestions for further changes in the documents which he thought benefitted him, and which we often agreed to incorporate for him."

Subsequently, on March 16, 1989, defendant wrote plaintiff stating that he would prefer to leave the two units as condominiums, rather than to have fee simple ownership. However, Attorney testified that he later had several conversations with defendant about this letter. He told defendant that:

we would not proceed [with the purchase of the adjoining lot] if we did not terminate the existing condominium arrangement involving [the two units]. I said that our feeling was that a two unit condominium was not workable, ... and we were going to insist that [the two units] be put into fee ·simple.

During one of these conversations, Attorney stated that defendant indicated that he no longer had the preference that he had stated in his earlier letter to keep those units as a condominium, but that he understood the reasons why we felt it was important to separate them, and that he reviewed the document and he was happy with it. He was going to sign it.

Further, defendant's intention to terminate the condominium status is evidenced in a letter dated September 1, 1989. This letter, in response to correspondence from Attorney, stated, "Will look forward to the documents terminating the condominium agreement and replacing it with the party wall agreement."

Again, conflicts in evidence are for the trial court. On review of the whole record, there is sufficient evidence from which the trial court could have concluded that defendant agreed to execute documents terminating the condominium plan.

### B. Statute of Frauds

■ Next, defendant alleges that even if such an agreement exists, it was oral; thus, it violates the statute of frauds. Plaintiff does not dispute that the agreement falls within the Statute of Frauds. Generally, an oral agreement involving an interest in land is unenforceable absent some writing signed by the party charged. § 432.010, RSMo 1986.

However, Missouri recognizes several exceptions, one of which is promissory estoppel. This exception was noted in *In re Jamison's Estate,* 202 S.W.2d 879, 886 (Mo.Div. 1 1947). The court quoted from § 90 of the Restatement of the Law of Contracts (1932):

A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

Here, the evidence supports a finding that defendant promised to sign the documents to terminate the condominium agreement and create a party wall. Attorney had drafted several documents and sent them to defendant to review and approve. Attorney testified that on March 31, 1989, defendant said that the party wall agreement was "okay as is," and he agreed to the termination of the condominium. Attorney's contemporaneous notes confirm his oral testimony.

Further, defendant's September 1, 1989 letter supports Attorney's testimony. In that letter, defendant said that he was looking forward "to the documents terminating the condominium agreement and replacing it with the party wall agreement."

Plaintiff relied on defendant's promise when he purchased the adjoining lot. Attorney advised defendant that plaintiff would not purchase the adjoining lot if "we did not terminate the existing condominium arrangement" involving the parties' two units. Thereafter, on May 1, 1989, plaintiff signed

the purchase contract and ultimately paid $225,000 for the lot.

Plaintiff's reliance on defendant's promise was foreseeable. Prior to plaintiff's purchase of the adjoining lot, defendant told Attorney "that he understood the reasons why we felt it was important to separate them, and that he reviewed the document and he was happy with it. He was going to sign it."

The final factor to consider is whether a failure to enforce the contract would result in injustice. *Jamison's Estate*, 202 S.W.2d at 886. The Restatement (Second) of Contracts, § 139(2) (1981), states:

> In determining whether injustice can be avoided only by enforcement of the promise, the following circumstances are significant:
>
> (a) the availability and adequacy of other remedies, particularly cancellation and restitution;
>
> (b) the definite and substantial character of the action or forbearance in relation to the remedy sought;
>
> (c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence;
>
> (d) the reasonableness of the action or forbearance;
>
> (e) the extent to which the action or forbearance was foreseeable by the promisor.

In applying these factors, we conclude that an injustice can be avoided only by the enforcement of defendant's promise. Plaintiff cannot undo the purchase of the adjoining lot; cancellation and restitution are not available. Plaintiff expended a substantial sum to purchase the lot. Moreover, the making and terms of the agreement are established by clear and convincing evidence.

Further, plaintiff's action was reasonable. By purchasing the adjoining lot and terminating the condominium agreement on the parties' two units, plaintiff anticipated that both plaintiff and defendant would benefit from the removal of the building next door. Further, unless the condominium agreement was terminated, deadlocks could occur on future decisions, as each party would have an equal vote. Finally, as noted above, plaintiff's action was foreseeable by defendant. Point denied.

The trial court ordered defendant "to execute the documents necessary to effectuate the termination of any existing condominium plan." We interpret that order to refer to the document which includes the contingency of obtaining the necessary zoning variance, as set forth in Exhibit 40.

The trial court's judgment is affirmed, subject to the clarification that defendant has a six foot easement as set forth in section II.

CARL R. GAERTNER and AHRENS, JJ., concur.