**Edward J. CHESUS, Charles & Janice Cantrell, Larry Rohovit, William Raup, and Cedar Creek Homes Association, Respondents,**

v.

**Dennis and Roxie WATTS, Appellant.**

No. WD 52746.

Missouri Court of Appeals, Western District.

March 3, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 28, 1998.

Application for Transfer Denied June 16, 1998.

James G. Trimble, Parkville, for Appellant.

Alex M. Lewandowski, Kansas City, for E. Chesus and C. & J. Cantrell.

Larry Rohovit, Lee's Summit, pro se.

William Raup, Lee's Summit, pro se.

David B. Raymond, Kansas City, for Cedar Creek Homes Association.

Before LOWENSTEIN, P.J., and SPINDEN and HOWARD, JJ.

LOWENSTEIN, Presiding Judge.

This is a suit arising out of the failure of defendants Dennis and Roxie Watts ("Watts"), the developers of Cedar Creek, to carry out stated plans for the Cedar Creek residential housing development including: (1) transfer of common areas to the Cedar Creek Homes Association ("Association"); (2) construction of a water drainage system, sewer system, and roadway in compliance with state laws and Lee's Summit ordinances; (3) providing accessibility to ten acres of common areas; (4) development of the common areas, and (5) landscaping along the road at Cedar Creek. The plaintiffs-respondents include some individual purchasers of lots as well as the Cedar Creek Homes Association.[1] This case comes to this writer on reassignment.

At trial, the Watts were not represented by counsel, but instead made the decision to proceed *pro se*. During the court-tried case, the Watts did not present any evidence on their own behalf. Thus, the only evidence considered at trial, and before this court on appeal, is the evidence of the plaintiffs. The trial court issued no findings of fact or law as none were requested by the parties. Because a relatively poor record was made at trial, some of the facts have been difficult to ascertain. However, those facts discernable from the record are viewed in the light most favorable to the judgment. Rule 73.01(a)(3).

Cedar Creek is a residential single-family housing development situated in the City of Lee's Summit consisting of two plats of land. In November of 1983, after Watts had filed the first plat of land with Jackson County, Watts prepared to sell individual lots in Cedar Creek. Buyers would purchase the vacant lots, generally for around $35,000 to $45,000, and then build their own homes at their leisure. Watts was to provide streets, storm drainage, and common areas.

Beginning in 1984, the Watts marketed Cedar Creek as a unique, upscale, single family development. In marketing the development, the Watts took full advantage of Cedar Creek's natural setting, stating that, "Cedar Creek is its land ....its stream and brooks, its rocks, its maples, oaks and evergreens, its rolling hills, its waterfalls." The evidence suggests that the Watts intended to combine Cedar Creek's natural beauty with the promise of quality amenities and the "unique designs" of Watts and Frank Brown to induce individuals to buy lots in Cedar Creek.

1. Cedar Creek Homes Association is a Missouri not-for-profit corporation formed to hold title to designated common areas in Cedar Creek.

To further facilitate the sale of lots in Cedar Creek, the Watts prepared a sales brochure for potential buyers which explained the plans for the Cedar Creek development. Plaintiffs Edward Chesus, Janice Cantrell, and Larry Rohovit each testified that they received this brochure during an open house in May, 1984. The open house was held in a newly-constructed home located on lot number three in Cedar Creek. The sales brochure indicated, among other things, that Cedar Creek "**has been** preserved with utilities (water and electricity) underground, split rail fencing, a private country lane, nature trails, and stream-side picnic areas." (emphasis added) The brochure implied that these amenities were going to be provided as part of the development.

In addition to promising certain amenities, the brochure implied that the amenities would be first-class. The Association's Declaration of Covenants and Restrictions states that Cedar Creek is to be maintained as an "attractive, prestigious development." From the language of the brochure, one is led to believe that Watts and landscape designer Frank Brown were uniquely-qualified developers planning a first-class community. The brochure portrayed Dennis Watts as an individual "widely known for his craft," citing feature articles of Watts in The Kansas City Star newspaper and Workbench magazine as evidence of "his unique designs and eclectic style." Frank Brown was enlisted to design and engineer the storm drainage along the road ["Cedar Creek Lane"] at Cedar Creek. Continuing the theme of first-class craftsmanship, the sales brochure stated that "[t]he Watts did not call an engineering firm picked at random from the phone book; instead, they chose Frank Brown (whose offices are in Philadelphia) because his work is unique in its approach to design." The Watts claimed that Frank Brown designed and constructed grass swales and rip-rap along Cedar Creek Lane.

The facts indicate that at the time the individual plaintiffs, sans the Raups, attended the open house, Cedar Creek was largely undeveloped. Although a "preliminary" road did exist so that prospective purchasers could see the individual lots, the road and storm drainage were not completed and the common areas were not developed at all. Testimony at the trial, in 1995, revealed that the Frank Brown landscaping had only been completed from the entrance of the development to the house on lot number three, where the open house was presented. This was the only part of the development that prospective purchasers saw as they drove up to the open house. Based on the appearance of Cedar Creek at the time of the open house, and the language in the brochure, potential buyers were led to believe the landscaping would continue down the entire length of Cedar Creek Lane once the subdivision was further developed. Plaintiffs testified that the storm drainage, rip-rap, and other landscaping have never been constructed for any other portion of Cedar Creek.

The Watts also orally promised many unique amenities to prospective buyers as part of the various common areas. The Rohovitts visited Cedar Creek several times before they purchased their lot. On one such visit in April of 1984, Watts told the Rohovitts that Tract A, the common area located in the first plat, was going to contain hiking trails, jogging trails and picnic areas. Watts also told the Rohovitts that there was going to be a millpond, covered bridge, and waterfall constructed. In addition, Dennis Watts told Mr. Chesus that Tract B, the common area located in the second plat, would be another accessible common area that would consist of nature trails and jogging or walking areas. Testimony by the plaintiffs established that the Watts represented that Tract C would be yet another common area, located just off of Cedar Creek Lane, with picnic tables, barbeque pits, a shelter, and a playground. At the time of the trial, Tract C still had not been transferred to the Association, remained undeveloped, and contained a slime pond in the middle of it.[2] The Watts created the Association to maintain these common

---

2. The Watts failed to convey Tract C to the Association prior to institution of this case, thus, plaintiffs' petition requested, in a separate count for specific performance, that Tract C be transferred from the Watts to the Association. The trial court ruled in favor of plaintiffs on this issue, and defendants did not appeal.

areas and protect against depreciation in value of the lots. There is no question that these statements were made, and trial testimony indicates that the Watts couched their representations in terms of "we will" rather than in terms of "we might." For reasons not on the record and unknown to this court, and in spite of repeated requests by the lot owners and later the Association, the Watts have never constructed any of the promised amenities.

Not only did the Watts not develop the common areas as represented, but the Watts did not provide reasonable access to the common areas. Again, the lot owners and the Association made repeated requests to the developer to provide accessibility to these common areas and the Watts have done nothing. Chesus testified that Tract A was not, and still is not, readily accessible from the access easement created by the Watts. Chesus stated that the easement contained "some large stones and rocks and drainage areas, and it's extremely rough, very rough." According to Chesus' testimony, an individual would have to cross a creek with eight or nine foot vertical embankments on both sides in order to get to Tract A. Chesus further testified that Tract B was inaccessible from the access easement created by the Watts because a person would have to climb down "a rock cliff that is probably 15, 16 feet in the air" in order to reach Tract B.

The Watts also informed prospective buyers that the buyers would be able to install septic tanks, rather than hooking up to sewer lines. Before a septic tank can be installed in Lee's Summit, the property must pass a ground percolation test. Mr. Chesus and Mrs. Cantrell both testified that prior to purchasing their lots, the Watts represented to them that their properties had passed the ground percolation tests. However, evidence at trial established that 18 months prior to the sale of lots to any of the plaintiffs, Ron Eilers, the Superintendent of Inspections for Lee's Summit, stated at the Planning Commission's meeting on October 24, 1983 that septic tanks were **not** acceptable in Cedar Creek because of poor results during the percolation test. Mr. Watts attended this meeting to obtain final approval of Cedar Creek's first plat, and was aware of Eiler's finding that septic systems were not acceptable. Yet the Watts still represented to Plaintiffs, more than six months later, that septic tanks could be installed at Cedar Creek. Although the record does not unequivocally state that Watts had knowledge of the Superintendent's findings, when viewed in the light most favorable to the judgment the facts indicate the Watts knew septic tanks were unacceptable at Cedar Creek and that the Watts still represented to Plaintiffs that such a system could be installed.

Later, after plaintiffs discovered they could not install septic tanks on their lots, they had no choice but to hook up to the Watts' sewer line, for a fee of $1500 payable to the Watts. The record indicates that the Watts never obtained a permit for their sewer system and that it is not in compliance with state regulations. Mr. Raup testified that portions of the sewer line are exposed to the outdoors rather than buried at the appropriate depth. After repeated requests by the homeowners to remedy the situation, the Watts have still refused to reconstruct the sewer lines in compliance with state regulations.

The Chesuses and Cantrells purchased their lots from the Watts in May of 1984. The Rohovitts bought their lot from the Watts in April of 1984. Unlike the other lot owners, the Raups purchased their lot from a third party rather than from the developer in November of 1987. At trial, Mr Raup indicated that he had not seen the sales brochure prior to purchasing their lot, but that his wife may have read it. Raup testified that he was primarily concerned about "the sewer and the streets," and that he was not concerned with the parks and common areas because "we didn't buy there for that."

Careful review of the record makes it apparent that the Watts, as developers, have done an extremely poor job of developing and maintaining the Cedar Creek subdivision. At the time Watts finally conveyed the roadway and Tracts A and B to the Association in 1987, the road was already beginning to deteriorate. During construction of the road, Watts obtained variances to narrow the

width of the road and to bypass the requirement of curbs, gutters, sidewalks, and storm sewer pipes, but again did not comply with city ordinance requirements. The road was poorly constructed and not maintained, the sewer system was not built according to code, and the common areas are still untouched and inaccessible. Furthermore, the water lines and road were not laid within the prescribed easements. There are no waterfalls, no covered bridge, no nature trails, and no picnic areas. The mill pond was not developed, and a stinking "slime pond" sits in its place.

It is clear from Mr. Watt's comments at trial, when he attempted to cross-examine the plaintiffs, that the Watts hoped to create a document which would persuade individuals to purchase lots in Cedar Creek but not bind him to any of the reasonable inferences or promises within the document.

*Procedural History*

In 1989, after several futile attempts to get the Watts to construct the promised amenities, the Association and individual plaintiffs: Edward & Carol Chesus, Charles and Janice Cantrell, Larry and Carole Rohovit, and William and Norma Raup, brought an action against defendants, Dennis and Roxie Watts, in a four count petition claiming: (I) fraud and misrepresentation; (II) specific performance; (III) breach of contract; (IV) negligence.

As mentioned earlier, the Watts were not represented by counsel. In addition to their own testimony, Plaintiffs presented expert testimony from an engineer, a real estate appraiser, and a real estate sales and management consultant. Dennis Watts cross-examined most of the plaintiffs' witnesses, however, the Watts never objected to any of the plaintiffs' witnesses or evidence presented at trial and did not present any evidence on their own behalf.

At trial, Plaintiffs, under theories of fraud and breach of contract, asked that the individual homeowners receive compensatory damages of 25% of either the current appraised value, or the sale price, of their lots and homes. Plaintiffs based this figure on expert testimony that the properties in Cedar Creek were worth 25% less than they

would be if the Watts had built the road, storm drainage, and sewer lines in conformance with applicable statutes and ordinances, and if the Watts had constructed the trails, picnic areas, and other common area improvements as they had originally represented. In addition, Plaintiffs requested that the Association receive compensatory damages of $235,042 to cover the cost of repairing the street, sewer lines and storm drainage and developing the common areas. Plaintiffs also requested punitive damages on their fraud count.

The trial court rendered judgment for the Chesuses, Cantrells and Rohovitts for fraud and misrepresentation, awarding compensatory and punitive damages. The Association received specific performance for conveyance of Tract C. The Raups and the Association both received judgment for breach of contract. The defendants prevailed on the negligence count. Defendants appealed the judgment only as to the fraud and breach of contract claims.

Under the fraud claim, Edward and Carol Chesus were awarded $125,000 for compensatory damages and $5000 for punitive damages; Charles and Janice Cantrell were awarded $75,000 for compensatory and $5000 for punitive damages; and Larry and Carole Rohovit were awarded $78,750 for compensatory and $5000 for punitive damages. The Chesus' and Cantrell's compensatory damage award represented 25% of the total appraised value of the lot and house in each case, and the Rohovit's compensatory damages represented 25% of the price for which they sold their home. Under the breach of contract claim, William and Norma Raup were awarded $65,000 as compensatory damages, and the Association was awarded $235,000 as compensatory damages. The Raup's compensatory award represented 25% of the estimated current value of their property.

The Watts raise six issues on appeal: (1) there was no competent and substantial evidence to support the judgment in favor of the Association for breach of contract; (2) the trial court erred in granting judgment for the fraud and misrepresentation claim because there was insufficient evidence to establish

that the Watts knew their representations were false at the time they made the representations; (3) the trial court improperly calculated the damages for a fraud and misrepresentation action; (4) there was insufficient evidence to support a judgment of punitive damages; (5) there was no competent and substantial evidence to support the judgment in favor of the Raups for breach of contract; and (6) the court erred in granting judgment against Roxie Watts.

■ Since this was a court-tried case, this court must uphold the trial court's judgment unless: (1) it is not supported by the evidence, (2) it is against the weight of the evidence, or (3) the court has erroneously declared or applied the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.1976). On appellate review, this court must give due regard to the opportunity of the trial court to have judged the credibility of witnesses. Rule 73.01(c)(2).

### Breach of Contract Claim by the Association

As previously noted in the facts portion of this opinion, the trial court rendered judgment in favor of the Association in the amount of $235,000 for breach of contract damages, a figure that paralleled the evidence as to the cost to build and repair the road, drainage system, sewer system, and the common areas. The Watts contend the Association failed to plead or prove a contract existed between the Association and the defendants.

Evaluation of this point presents two interrelated questions: (I) is the Association the proper party with standing to bring an action against the developer for breach of contract on behalf of the individual purchaser-owners; and (II) if promises made by the developer are not sufficient to establish a written contract between the Association and the developer, can the Association recover under the doctrine of promissory estoppel? This court answers both these questions in the affirmative.

It appears that very few Missouri cases have previously considered whether a homeowners association has standing to sue a developer for breach of contract. In *Terre Du Lac Ass'n, Inc., v. Terre Du Lac, Inc.*, 737 S.W.2d 206 (Mo.App.1987), the Eastern District of this court held that a homeowners association had standing, on behalf of its members, to bring an action against the developer for failure to convey roads and certain common areas to the homeowners association. Id. at 215–16. The court stated that the powers of the homeowners association are extensive in enforcing the common rights of owners, and that, because of the time and expense involved, prospective purchasers would necessarily look to an association to protect the individual owners' interests. Id. at 216. In footnote 2 at page 214, the court compiled cases from other states, which had granted standing to homeowners associations when "at least one of the association's members was suffering immediate or threatened injury and the nature of the claim and relief sought did not make the individual participation of each injured member necessary." *Id.*

In *Terre Du Lac*, the developer made representations to the lot purchasers both orally and in advertisements that all the roads would be permanently surfaced with asphalt and that all common amenities would be conveyed to the homeowners association. The court in *Terre Du Lac* held that the homeowners association had standing to sue as a third-party donee beneficiary to the real estate contract between the developer and the individual lot buyers, as defined in § 133 of the Restatement of Contracts. Id. at 213. Because the issue in *Terre Du Lac* arose during an appeal from the trial court's dismissal of the homeowners petition, the Eastern District never reached the underlying issue of whether a contract existed between the developer and the individual lot buyers.

■ For a third party beneficiary status to emerge, there must, at the least, be an underlying contract between the promisor and the promisee. Restatement (Second) of Contracts § 304 cmt. b (1981); *See also* Metzger and Phillips, *Promissory Estoppel and Third Parties*, Vol. 42 Sw. L.J. 931 (1988). A third party beneficiary is one who is not privy to a contract or its consideration but one to whom the law gives the right to

maintain a cause of action for breach of contract. *Laclede Investment Corp. v. Kaiser*, 596 S.W.2d 36, 41 (Mo.App.1980). Third party beneficiary status depends not so much on a desire or purpose to confer a benefit on the third person, but rather on an intent that the promisor assume a direct obligation to him. *Id.* at 41–42. Although it is not necessary that the third party beneficiary be named in the contract, the terms of the contract must express directly and clearly an intent to benefit an identifiable person or class. *Id.* at 42.

■ In the present case, the facts are hazy—the only written contract between the developer (the promisor) and the individual purchasers (the promisee) was for the sale of a lot. The real estate contracts contained no specific promises as to common areas, roads, drainage, or sewage removal. Thus, the Association cannot rely on the individual real estate contracts to assert third-party beneficiary status. Likewise, the facts do not indicate that the Watts' representations created a contract directly between the Watts and the Association. Rather, to have standing as a third-party beneficiary, the Association must establish that the Watts' written and oral representations created a contract between the Watts and the individual lot purchasers.

■ The trial court found that there was sufficient evidence presented to establish a contract. Unfortunately, because no conclusions of law or findings of fact were given, it is unclear what legal theory the trial court

relied on to find that a contract existed. On appeal, this court gives due regard to the opportunity of the trial court to judge the credibility of witnesses. Rule 73.01(c)(2). The trial judge as trier of fact may disbelieve testimony even if it is uncontradicted. *Johnson v. Gregg*, 807 S.W.2d 680, 685 (Mo.App. 1991). When, as in this case, the trial court makes no specific findings of fact, this court will consider all fact issues to have been found in accordance with the result reached. Rule 73.01(a)(3); *Brown v. Mercantile Bank of Poplar Bluff*, 820 S.W.2d 327, 334 (Mo. App.1991). After careful review of the facts, this court finds that, in this case, the Association has standing to sue under a theory of promissory estoppel, as established in § 90 of the Restatement (Second) of Contracts (1981). As such, it is unnecessary to determine the Association's status as a potential third-party beneficiary.

■ Promissory estoppel, or the conduct-in-reliance doctrine, has been extensively developed by Missouri common law.[3] ERIC MILLS HOLMES, CORBIN ON CONTRACTS, § 8.10, at 36 (1996). While this court realizes the doctrine of promissory estoppel should be "used with caution, sparingly and only in extreme cases," the facts of the present case warrant its use. Because promissory estoppel serves as an equitable remedy where an express contract does not exist, the court must only apply the doctrine in those situations where an unjust decision would otherwise result.[4] See e.g., *Geisinger v. A &*

---

**3.** See, e.g., *Skaggs v. Dial*, 861 S.W.2d 188, 191 (Mo.App.1993) (Equity would allow oral agreement for sale of real property where eight elements were proved); *Chicago Title Ins., Co. v. First Mo. Bank of Jefferson County*, 622 S.W.2d 706, 708 (Mo.App.1981) (equitable estoppel was invoked where party asserting doctrine changed its position in reliance of the promise and a gross injustice would be averted); *Commercial Bank of Gideon v. Bien, Co., Inc.*, 830 S.W.2d 503, 505 (Mo.App.1992) (court utilized promissory estoppel where: a promise existed, there was detrimental reliance, the promisor should have clearly foreseen to action of promisee, and injustice could only be avoided by enforcement, so that the bank was allowed to recover when it had relied on a letter of a borrower).

**4.** In the present case, the appellant-defendant never raised the statute of frauds as a defense to

the breach of contract claim, and as such it is considered waived. *Norden v. Friedman*, 756 S.W.2d 158, 162 (Mo.1988). Had the statute of frauds not been waived, the defense still would have been tenuous at best. While the statute of frauds can preclude the use of promissory estoppel in cases where the doctrine would circumvent the goal of the Statute of Frauds, it will be ignored to prevent an unjust result. *See Davis v. Nelson*, 880 S.W.2d 658, 665—67 (Mo.App.1994) (where court enforced oral promises of condo owner to a later purchaser, despite Statute of Frauds, where plaintiff relied to his detriment). *See also Becker v. Lagerquist Bros. Inc.*, 55 Wash.2d 425, 348 P.2d 423 (1960) (where court held that a promise to lot purchasers by a vendor, to pave streets, is not an agreement for the sale of an interest in land and, therefore, may be oral as it does not fall within the statute of frauds.)

*B Farms, Inc.*, 820 S.W.2d 96, 98 (Mo.App. 1991), and *Moore v. Missouri–Nebraska Express*, 892 S.W.2d 696, 703 (Mo.App.1994).

■■■ From the First Restatement of Contracts § 90 (1932), Missouri courts have established the four elements necessary to sustain a promissory estoppel claim. They are: (1) a promise; (2) promisee detrimentally relies on the promise; (3) promisor could reasonably foresee the precise action the promisee took in reliance; and (4) injustice can only be avoided by enforcement of the promise. *Moore v. Missouri–Nebraska Express, Inc.*, 892 S.W.2d at 703.

For years prior to the (second) Restatement of Contracts, § 90, several states had already accepted a third party theory of recovery under promissory estoppel. One example is Nevada in *Lear v. Bishop*, 86 Nev. 709, 476 P.2d 18, 22 (1970). There a third party had a contract to sell property to the state. The defendant promised by letter it would be a co-purchaser of the property. Seller, relying on that letter altered its position, and the defendant refused to honor the letter. The Court noted that section 90 under the first Restatement of Contracts did not extend to third parties, however the court held that the third party had reasonably relied on the promise, and such reliance was foreseeable, and an injustice could only be avoided by forcing the defendant to honor the promise. *See generally Hoffman v. Red Owl Stores, Inc.*, 26 Wis.2d 683, 133 N.W.2d 267 (1965); *Burgess v. California Mutual Building & Loan Ass'n*, 210 Cal. 180, 290 P. 1029 (1930).

Likewise, in *Briarcliffe West Townhouse Owners Ass'n v. Wiseman Const., Co.*, a problem arose with regard to storm drainage in the common area. The court in *Briarcliffe* held that the association had standing to bring an action against the developer as representative of the individual townhouse owners, even though the association was not in existence when the agreements were made. *Briarcliffe West Townhouse Owners Ass'n v. Wiseman Const., Co.*, 118 Ill.App.3d 163, 73 Ill.Dec. 503, 454 N.E.2d 363, 365—70 (1983).

In 1981, the Restatement (Second) of Contracts made additions to § 90 that extended the equitable remedy to parties other than the original promisee, so long as the elements of the doctrine are met. Metzger and Phillips, *Promissory Estoppel and Third Parties*, Vol. 42 Sw. L.J. at 931 & 951 (1988). The Restatement (Second) of Contracts has been recognized and cited by this state in both *Prenger v. Baumhoer*, 939 S.W.2d 23, 26 (Mo.App.1997) and *Delmo, Inc., v. Maxima Electrical Sales, Inc.*, 878 S.W.2d 499, 504 (Mo.App.1994). In the comments to section 90, the Restatement indicates that if a promise is made to one party for the benefit of another, "it is often foreseeable that the beneficiary will rely on the promise. Enforcement of the promise in such cases rests on the same basis and depends on the same factors as in cases of reliance by the promisee." RESTATEMENT (SECOND) OF CONTRACTS § 90, cmt. c (1981). The pertinent portion of Section 90, with the 1981 additions highlighted, is now set out.

§ 90 Promise Reasonably Inducing Action or Forbearance

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee *or a third person* and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. *The remedy granted for breach may be limited as justice requires.*

■■■ The additional language in the Restatement (Second) of Contracts enables a homeowners association to assert standing as a third party relying on the developer's promises to the individual lot purchasers.[5] In the present case, the Association asserts standing as a third party by relying on the

---

5. Another method by which the Association might assert standing is found in the Preliminary Draft No. 14 of the RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES), September 15, 1997. Section 6.11 states that, "Except as limited by statute ... the association has the power to institute ... litigation ... in its own name on behalf of itself or on behalf of other property owners...." Id.

at 207. Unless prohibited by law or it's governing documents, the Association should normally have standing to bring litigation against the developer for the developer's deficiencies with regard to common property or issues common to all owners and members of the Association, much as in the principles of class action litigation. Id. at 208.

Watts (the promisors) promises to the individual plaintiffs (the promisees). The Association, via its individual members' expectations, relies on the developer's promise to develop the common areas and convey them to the Association. Application of the doctrine is somewhat confusing in the present situation because at the time of reliance, when an individual purchases the lot from the developer, the individual plaintiff is representing the interests of the promisee and the "third person" Association.

To understand this unique interrelation between the developer, the lot buyer, and the Association, one must recognize the role and legal status of a homeowners association in the early stages of a real estate development. In these early stages, the association cannot be categorized with ordinary business relationships. As pointed out in Hyatt and Rhoads, *"Concepts of Liability in the Development and Administration of Condominium Home Owners Associations",* 12 Wake Forest L.Rev. 915 (1976), the function of homeowners associations changes rapidly as the development proceeds. Membership in the association is mandatory upon purchase of the lot, and with membership comes dues, assessments and restrictions on the use of the lot as contained in the association's declaration. The association "provides a vehicle for individual owners to work together" to serve their new community or neighborhood, and it also operates as a sort of "quasi-governmental entity" to provide members utility service, road maintenance, and refuse removal. Generally, the developer reserves total control of the association until a substantial number of units are sold, and the developer then turns control over to the unit owners. Id. at 973.

During the marketing phase, the developer is in a position of "control and confidence" not only to the association, "but also to those he seeks as purchaser-members," so, "questions concerning the [homeowners association] should not be disposed of purely 'within the corporate framework.'" Id. at 975. In reference to the early period when units or lots are being sold to the public and the developer is still in control of the association, Hyatt and Rhoads say:

The effect is that the developer during the period has two separate and distinct loyalties: the operation of the association and the development and marketing of the project. There is an inherent conflict of interest in this situation, for some decisions will of necessity have to be made that benefit one loyalty at the expense of the other.

Likewise, Preliminary Draft No. 14 of the Restatement (Third) of Property (Servitudes), September 15, 1997, notes in part V, which deals with the unusual relationship between the developer and the common interest community, that

The developer and the purchasers of property in a common interest community have interests in controlling the common property and the association that may come into conflict. The developer's primary interest is in completing and selling the project, while the purchasers' is in maintaining their property values and establishing the quality of life they expected when buying the property. Id. at 331.

The preliminary draft further states that the developer has a duty to create an association for the management of the common areas, to protect the developer's interest, and, after a reasonable time, to turn the management over to the association the developer has created.

In addition to the duty a developer owes the association, the Restatement authors suggest the association, upon taking control over the common areas, may treat as voidable any contract made by the developer which exhibits self-dealing or which is unconscionable to the property owners. Id. The rationale behind this comment is gleaned from *Knight v. City of Albuquerque,* 110 N.M. 265, 794 P.2d 739 (App.1990), where the developer, who had reserved the right to make changes from the plat, sought to change open spaces into a hotel. The plaintiffs were told and sold on the promise the space would be a golf course. The court, in holding for the purchasers denied the right of a developer to "simultaneously use a subdivision plot showing open space as a selling tool, yet retain the right to unilaterally change the character of the open space. Such a result is patently unfair, and violative

of public policy." *Id.* at 740. The court stated that the plaintiffs had a private right in equity based in part on estoppel. An earlier case from the Supreme Court of New Mexico, *Ute Park Summer Homes Ass'n v. Maxwell Land Grant Co.*, 77 N.M. 730, 427 P.2d 249, 253 (N.M.1967), held that "common honesty" compelled a ruling holding the developer to his selling promises as to open areas where "the purchasers have acted upon such inducement." Id. See also *Callahan v. Ganneston Park Development Corp.*, 245 A.2d 274, 277—78 (Me.1968). (Where purchaser who was induced to buy corner lot on a cul-de-sac prevailed on an estoppel theory when the change was to making his lot an interior lot on a busy through street.)

It would appear the factual matrix in this case fits squarely within promissory estoppel as enunciated in Section 90 in the Restatement Second of 1981. The testimony at trial established that the Watts did, in fact, make representations, both written and oral, to the plaintiffs regarding the common areas, the road, the storm drainage, the sewers, and the landscaping. The Association was clearly designated as the entity to take title for and responsibility of the improvements. The plaintiffs, relying on the Watts representations, purchased lots at Cedar Creek and subsequently built expensive homes on the lots which they had bought for premium prices. Mr Chesus testified that the Watts made it a point to tell the Chesuses, at the open house, that Cedar Creek was within the city limits and therefore subject to all the building codes and restrictions of Lee's Summit. When the developer makes affirmative representations that construction in the development is subject to certain regulations, reliance by a prospective buyer on those representations is certainly reasonable.

■ The preceding cases and the theory proposed in the Restatement give purchasers an equitable remedy by way of estoppel where substantial changes are being made to sales promises which induced the purchase. Considering that the purchasers relied on the Watts to convey the three common areas to the Association, the Association planned on receiving the conveyances, the areas were to be improved by certain features, and the Association is now left with two unimproved inaccessible plots and one which they had to sue to get, the doctrine of promissory estoppel binds the developer to his prior promises which induced the plaintiffs' purchases. The developer owes a duty to the Association to turn over common areas that are not substandard and that are in good repair, and failing to do so incurs the liability "to bring the common areas up to standard." *Goddard v. Fairways Development General Partnership*, 310 S.C. 408, 426 S.E.2d 828—29 (S.C.App.1993).

While this court realizes that, generally, courts should be reluctant to enforce oral promises, a decision holding that the lot purchasers should not have relied on the Watts' oral promises and written sales brochure would create even more problems. To uphold the Watts' contention that no contract existed between the Watts and the individual owners or the Association would effectively leave the plaintiffs without a legal remedy. Under the Watts' argument, because there was no definitive written contract between the individual owners and Watts requiring, for example, that the method of sewage disposal be in compliance with state and local laws, the Association would be unable to attain the status of a third-party beneficiary and denied a chance for relief. *See* RESTATEMENT (SECOND) OF CONTRACTS § 304 (1981).

■ When a development is a work in progress, a lot buyer should be able to rely on the developer's oral representations regarding amenities and basic services. To hold otherwise, would require prospective buyers to insist that every detail of the development's plan be in a written binding contract. Such a requirement would be impractical, time-consuming, and would likely discourage developers from providing a variety of amenities. In order to spread the risk of loss in a new development, the developer needs some leeway in which to make changes to the development when unforeseen circumstances arise. If the developer is faced with the prospect of entering a binding contract regarding common amenities to be constructed, the developer may choose to simply not provide such amenities,

or spread the risk of loss in different ways, such as increasing the sale price of the lots.

In addition, to require an arms length contract between Watts and the Association would be somewhat awkward and unrealistic. Watts created the Association, marketed and sold lots, and then turned over the reins to the people who bought and built homes on the lots he sold. It is hardly surprising that in the creation of the Association in contemplation of the development, Watts did not have a contract with the nascent Association that specifically required him to warrant, for example, the roads would be built to municipal requirements and they would be drained by the methods extolled in marketing literature.

In the case at bar, the purchasers were buying lots at a time when the development was just beginning to take shape. This is unlike a situation where the neighborhood was already developed prior to the individuals purchasing their land. The plaintiffs drove out to Cedar Creek and saw the potential of the development as it was related to them by the defendants. The facts of this case dictate that the court fashion an equitable remedy to prevent an unjust result.

■ Where the developer promises and fails to provide future amenities, and the developer is to convey certain common areas to the association, the association is the logical plaintiff to bring an action to provide for the missing amenities. Otherwise, the individual owners would be required, at their own expense, to file suit to repair property now in the ownership of the Association and property which is for the benefit of all the owners. Although not strictly plead, the evidence at this four-day trial was sufficient to establish the equitable remedy of promissory estoppel under Section 90 in favor of the Association and support the awarded damages to correct the glaring errors and omissions resulting from the Watts' development of the project.

■ This court's reliance on the Restatement (Second) of Contracts § 90 under the facts of this case should not be seen as authority to extend the bounds of promissory estoppel, under the previous common law, to

third parties in other cases. Buyers of condominiums have protection through Missouri's adoption of the Uniform Condominium Act, § 448.1–101, et. seq., RSMo.1994. Until the legislature offers similar protection to plaintiffs in planned residential developments where common amenities, common areas, and other inducements are promised in the marketing phase of the development, the courts must analyze each situation on a case by case basis. Individuals purchasing lots in new developments in Missouri should be able to rely, within the limits of reasonableness, on the sales promises of the developer.

The $235,000 figure to represent the costs of bringing all the common areas to the level originally promised was more than supported, and came in without objection. The fact that counsel for the Association left for much of the trial does not alter this reward. The judgment for contract damages in favor of the Association is affirmed.

### Fraud and Misrepresentation Claim

■ The trial court awarded three of the individual plaintiffs both compensatory damages and $5000 punitive damages on their counts for fraud. (The fourth individual, Raup, who still resides in the development, did not purchase from the Watts, but from a previous owner, and was awarded only contract damages, which have been reversed under the following section). The compensatory amounts for the Chesuses and Cantrells were based on witness testimony of the current value of their respective properties and what the value would have been had the improvements and amenities been provided. Plaintiffs' expert testified, without objection, the factor of the difference was twenty-five percent. The Rohovits had sold prior to trial, and the evidence established that they too would have realized twenty-five percent more had the common areas, roads and utilities been as promised.

The Eastern District of this court in *Murray v. Crank*, 945 S.W.2d 28, 31 (Mo.App. 1997) said:

> The elements of a submissible case of fraudulent misrepresentation are: 1) a false, material representation; 2) the speaker's knowledge of its falsity or his/

her ignorance of the truth; 3) the speaker's intent that his/her representation should be acted upon by the hearer in the manner reasonably contemplated; 4) the hearer's ignorance of the falsity of the representation; 5) the hearer's reliance on the representation being true; 6) the hearer's right to rely thereon; and 7) the hearer's consequent and proximately-caused injuries. (citing *Colgan v. Washington Realty Co.,* 879 S.W.2d 686, 689 (Mo.App.1994); which cited *Clark v. Olson,* 726 S.W.2d 718, 721 (Mo. banc 1987).

Watts' sole contention on the fraud count is that the evidence did not establish that he made statements of existing fact when marketing the development, but rather, that his statements related to his intent as to his future conduct. In essence, Watts says that this portion of the judgment should fail because his statements and the brochure language showed no more than his present intent, and the plaintiffs' evidence fails to show that Watts *never intended* to fulfill those promises at the time they were made by him. In other words, Watts asserts here that at most, this evidence would establish a breach of contact. However, as covered in the previous point, Watts concludes there was no contract with the individuals or the Association.

In *Stewart v. Kirkland,* 929 S.W.2d 321, 323 (Mo.App.1996), the court stated, after having stated that fraud is never presumed, that if the evidence presented at trial is as consistent with fraud as it is with honesty, the transaction will be deemed honest with all doubt resolved in favor of good faith. The court then held that:

> A promise accompanied by a present intent not to perform is a misrepresentation sufficient to constitute fraud. *Carlund Corp. v. Crown Center Redevelopment Corp.,* 910 S.W.2d 273, 279 (Mo.App.1995). Failure to perform alone, however, is not sufficient to establish the intent of the promisor at the time the agreement was made. Id. The mere giving of a promise, though breached the next day, does not give rise to an action of tortious fraud. Id.

To establish fraud, a plaintiff has to prove that the defendant not only breach-ed the contract, but that the defendant intended to do so when he made the contract. *Maupin v. Hallmark Cards, Inc.,* 894 S.W.2d 688, 697 (Mo.App.1995). The plaintiff has the burden of establishing that defendant did not intend to perform as promised. *Grossoehme v. Cordell,* 904 S.W.2d 392, 396 (Mo.App.1995); *see also Trotter's Corporation v. Ringleader Restaurants, Inc.,* 929 S.W.2d 935, 940 (Mo.App.1996).

In *Stewart, supra,* 929 S.W.2d at 323–24, the defendant promised to make a loan on certain property, and later discovered that other prior lien claimants existed and subsequently refused to make the loan. The plaintiff sued in fraud. The court held there was no evidence that the defendant did not intend, *at the time of the promise,* to carry out his promise, and decided to not carry out the promise only after the discovery of additional liens.

In *Murray, supra,* 945 S.W.2d at 29–30, the purchaser of a home across from a golf course sued for fraudulent misrepresentation when after a few months in the house, the homeowner "... began to experience problems with golf balls bombarding their property." Apparently, the golf course changed the tee location of one of its holes and as a result stray golf balls began to enter the purchaser's lot. The trial judge sustained the sellers' motion for summary judgment when their affidavits in support of the motion showed that the change in the location of the tee occurred after the sale and that the purchaser's problem with golf balls only arose thereafter. *See also Dillard v. Earnhart,* 457 S.W.2d 666 (Mo.1970) (No fraud when promisor's evidence showed he went to recorder's office to do what he had promised and the necessary document could not be found.)

Watts' argument that his oral and written representations did not contain statements of existing fact, but only his expectations for the future of the development, must be viewed in the same light the plaintiffs would consider them given the circumstances and the context of their use. *Haberstick v. Gundaker Real Estate Co., Inc.,* 921 S.W.2d 104, 109 (Mo.App.1996). Watts ar-

gues that his representations were merely statements expressing what he hoped to do with the property the potential buyers saw—wild land, muddy, with no improvements other than the road leading to the show house. The trier of fact, and indeed this court, can reasonably infer from the Watt's representations that: (1) the development was to be first class, (2) that the purchasers were justified in paying a substantial sum for their lots, and (3) that the purchasers relied on the Watts' representations when building their expensive homes on the property. What makes the facts here different from most misrepresentation cases is that the developer was selling parts of raw, undeveloped land, rather than an existing house or product. In addition, his statements to induce prospective purchasers to buy were definite promises that specific amenities and common areas would be provided. None of the Watts' promises were speculative of what might happen, nor did the promises require predicting events over which he had no control. Nor could Watts' promises be deemed as "mere puffery" in an advertising statement. *In re General Motors Corp. Anti–Lock Brake Products Liability Litigation*, 966 F.Supp. 1525, 1531 (E.D.Mo.1997).

Although the facts in *Shechter v. Brewer*, 344 S.W.2d 784 (Mo.App.1961) are not analogous to the case at bar; i.e., the seller said the foundation to the house was in good order and that immediately on possession that assertion proved to be incorrect, the language from this court in upholding a fraudulent misrepresentation suit holds true under the facts here some 36 years later. In *Shechter*, as here, the defendant sought to imply that the purchaser was negligent in not preventing the fraud, and that the representations were mere statements of opinion. "The tendency of modern decisions is not to extend, but to restrict the rule requiring diligence, and similar rules, such as caveat emptor, and the rule granting immunity for dealers to talk; to condemn the falsehood of the fraud feasor rather than the credulity of the victim." Id. at 788. The opinion went on to state that where the purchaser lacks equal facilities for ascertaining the truth on matters peculiarly within the knowledge of the seller and the purchaser relies, then fraud may be actionable. In the case at bar, representations that the property was approved for septic tanks and the drainage system had been designed by a Philadelphia expert were just that, representations, not opinions or predictions of what was to come. These representations are the same as in *Ackmann v. Keeney–Toelle Real Estate Co.*, 401 S.W.2d 483 (Mo. banc 1966), where the seller advertised that homes had an approved water supply, when such was not true. The court in *Ackmann* held that the seller's representations were actionable when the buyers testified they would not have purchased the homes had they known such was not true. Id. at 486.

Watts had total control over whether the inducements he made ever came to fruition. He was not predicting what the stock market would do, nor was he claiming his product was better than that of a competitor. The success of the project was entirely in Watts' hands. His statements and representations were "... of material facts and not mere statements of opinion, and were such that the purchaser not only was entitled to rely upon them, but did rely upon them to his injury." *Schnuck v. Kriegshauser*, 371 S.W.2d 242, 247 (Mo.1963).

Without disturbing the long-established rule that the plaintiff has the difficult burden to prove every element of fraud, once the plaintiff has made a submissible case, the defendant stands on shaky ground when, as here, he presents no evidence or explanation for his actions. In *Allison v. Mildred*, the Supreme Court of Missouri stated that, "while plaintiff ha[s] the burden of proof, the burden [is] on the defendants in the circumstances of record to go forward with evidence to show that [the defendant's] purchase was in good faith, without notice of the fraudulent purpose." *Allison v. Mildred*, 307 S.W.2d 447, 455 (Mo.1957). Once the plaintiff has met the burden of production and made a submissible case of fraud, the fact-finder is free to rule in favor of either party depending upon the credibility and weight given to plaintiff's evidence.

In *Grosser v. Kandel–Iken Builders, Inc.*, 647 S.W.2d 911, 913—14 (Mo.App.1983), the

claim was misrepresentation by the builder of a promise made years earlier in a brochure to build a swimming pool after eighty-five units were built, and of the failure to subsequently build the pool. The president of the defendant company testified that at all times he intended to build the pool but a subsequent study showed economic problems, at which time the defendant went to the residents for an assessment. The court held for the defendant after reciting the case law of fraud requiring proof the defendant intended not to perform at the time of the representation. In contrast, Watts has failed to explain via any evidence or reasonable inference why nothing he promised ever came true. He put on no evidence as to why he was thwarted in developing the common areas or adequate drainage for the streets.

■ Although fraud is not to be presumed, "it may be proven in its entirety by circumstantial evidence," *Colgan v. Washington Realty Company*, 879 S.W.2d 686, 691 (Mo.App.1994), for fraud "... can scarcely ever be proved by direct evidence ..." *Mark Twain Kansas City Bank v. Riccardi*, 865 S.W.2d 425, 428 (Mo.App.1993), and "has to be established by a number and variety of circumstances, which, although apparently trivial and unimportant, when considered singly, afford, when combined together, the most irrefragable and convincing proof of a fraudulent design." *Allison v. Mildred*, 307 S.W.2d 447, 453 (Mo.1957). See also *Watson v. Harris*, 435 S.W.2d 667, 673 (Mo.1968), *Herrold v. Hart*, 290 S.W.2d 49, 55 (Mo. 1956). "Fraud may be shown by circumstantial evidence; and other similar transactions in the course of a continuous, systematic course of dealing are admissible." *Blakeley v. Bradley*, 281 S.W.2d 835, 839 (Mo.1955). Our Supreme Court has said in *Louis v. Andrea*, 338 S.W.2d 96, 104 (Mo.1960), that in a fraud case, "much of the evidence can be inferred from the defendant's case[.]" In the present case, much can be inferred from the lack of a defendant's case where plaintiffs have already made a submissible case.

■ Watts attempts to look for justification in *Grosser, supra*, 647 S.W.2d at 915. In *Grosser* there was one promise which served to support the misrepresentation, that

there would be a swimming pool, but the location, size, maintenance, and ownership, was left unsettled. In the present case, Watts' representations regarding the roads, common areas, drainage, and sewage disposal comprised all the developer had to do. For example:

1) The plaintiffs were promised a permanent road. When finally deeded by the Watts, it was beginning to fall apart. The road was not up to code, and after this suit was filed, the explanation was that it was only a "preliminary road."

2) The promise was made in the brochure that Frank Brown had engineered a natural drainage system, and at the time the individual plaintiffs purchased their lots, the drainage system only existed at the entrance to the development. The system was never installed throughout the remainder of the development. In fact, Watts obtained a variance from the city on storm sewers and curbs, based on his promise to use the special method of drainage control.

3) A promise was made regarding the use of septic tanks and that the city had approved use of such a system in Cedar Creek. That was untrue. In fact, Watts had installed sewer lines for his own home at Cedar Creek. Construction went on without city approval, and the plaintiffs had to eventually hook on to Watts system for a $1500 fee. That system, when later examined by the Department of Natural Resources, was found to be unacceptable. The city had indicated in 1983 the land was unsuited for a septic system.

4) With regard to the common areas, the promise was made there would be three tracts, with C to be the focal point. C was never deeded—this lawsuit procured that tract. It contained the festering pond. Prior to this suit, part of C was taken by Watts for their front yard. The other two were inaccessible. Tract A was in a floodplain.

Watts did none of the above, and whether some of the above are strictly promises, representations, or statements of fact or hopes, *Sofka v. Thal*, 662 S.W.2d 502, 507 (Mo. banc 1983), the reasonable inference from all the facts is that when Watts made the represen-

tations, he never intended to be provide these amenities. The fact that prior to this suit Watts had not conveyed Tract C to the association and was using part of it for his own front yard is particularly illustrative that Watts never intended to provide Tract C or other amenities. Watts started making the promises in 1983—84, and even after repeated requests to rectify the situation, Watts never did and never explained why he failed to follow through on his promises, even in court in 1995. Therefore, this court rules on the fraud portion of the judgment that the trial court had sufficient evidence to award compensatory and punitive damages. However, the court has granted relief under the contract count which will enable the present landowner-plaintiffs (Chesus and Cantrell) to enjoy the benefits they were promised. So, to avoid duplication of actual damages, the compensatory fraud awards for Chesus and Cantrell will be reversed and remanded for entry of nominal damages of $1. Having determined the conduct of the Watts' sufficient for imposition of punitive damages, and the award of nominal damages being sufficient to impose punitive damages, those awards of $5000 will be affirmed. *Snodgrass v. Headco Industries, Inc.,* 640 S.W.2d 147, 156 (Mo. App.1982). The actual and punitive portions of the judgment as to the Rohovits, which sold their lot and house before this suit and presented evidence, without objection, of damages of $78,750, will be affirmed.

### Breach of Contract Claim by the Raups

■ As mentioned in the facts, the Raups did not purchase their lot from the Watts, but instead purchased it from a third party in November of 1987. The trial court awarded the Raups breach of contract damages in the amount of $65,000, representing 25% of the estimated current value of their property. The Raups, like the Chesuses and Cantrells, still reside in Cedar Creek. However, the court has granted relief under the Association's breach of contract claim which will enable the present landowner-plaintiffs at Cedar Creek to enjoy the benefits they were promised. As such, any damages the Raups may have sustained as a result of the reduction in the value of their house and lot, have already been compensated for by the Associ-

ation's award. Thus, this court need not determine whether substantial and competent evidence existed to support the Raup's breach of contract claim. In order to avoid the duplication of actual damages, the judgment for the Raups is reversed.

### Judgment against Roxie Watts

In their final point on appeal, the Watts argue that the court erred in granting judgment against Roxie Watts because: (1) the evidence was insufficient to establish that she was an owner or developer of Cedar Creek, and (2) Roxie Watts was not represented by counsel and did not engage in cross examination or present evidence.

■ A review of the transcript indicates fifteen references to the participation of Roxie Watts in Chesus' testimony, six references by Cantrell, and five references by Rohovit to specific dealings with Roxie Watts individually, or with her and Dennis Watts, collectively. The Watts presented no evidence at trial to refute Mrs. Watt's involvement with Cedar Creek. Furthermore, the Watts never objected at trial to Roxie Watts inclusion in the law suit. "Failing to make an objection to an issue at trial waives the issue on appeal." *Gulf Ins. Co. v. Noble Broadcast,* 936 S.W.2d 810, 816 (Mo.1997) (citing *Johnson v. Moore,* 931 S.W.2d 191, 195 (Mo.App.1996)). When, as in this case, the trial court makes no specific findings of fact, this court will consider all fact issues to have been found in accordance with the result reached. Rule 73.01(a)(3); *Brown v. Mercantile Bank of Poplar Bluff,* 820 S.W.2d 327, 334 (Mo.App.1991). Thus, this court finds that sufficient evidence existed at trial from which the trial court could enter judgment against Mrs. Watts.

■ Secondly, Roxie Watts made the decision to proceed pro se, despite the trial court's warning about the risks of proceeding without counsel. In addition, she was present during the entire trial, never made any objection to the trial proceeding without the presence of counsel on her behalf, and never made any indication that she wished to participate in the trial. As mentioned earlier, failing to make an objection to an issue at

trial waives the issue on appeal. *Gulf Ins. Co. v. Noble Broadcast,* 936 S.W.2d at 816. Any argument that she was not represented by counsel fails in that she made the decision to appear pro se at trial and, by not objecting at trial, she waived the issue on appeal. The appellant's point is denied.

The judgment is affirmed in part and reversed in part. The judgment is affirmed as to the award of actual damages in contract in favor of the Homeowners Association, but is reversed as to the Raups. For the tort of fraudulent misrepresentation, the judgment is affirmed in total for the Rohovits, but reversed and remanded as to Chesus and Cantrell to allow $1 actual damages, and is affirmed as to their punitive awards.

SPINDEN, J., concurs.

HOWARD, J., dissents in separate dissenting opinion.

HOWARD, Judge, dissenting.

I would decline to embrace the concept of a third party theory of recovery under promissory estoppel in this case.

I find it easy to sympathize with the plight of the homeowners. However, allowing this type of recovery molds the case into a form unrecognizable to the parties or the trial judge. This concept of relief has not been accepted in Missouri and was not pled, tried or argued at either the trial or appellate level. I would not breathe life into it at this juncture. Additionally, I do not believe plaintiffs can prevail on their original theories of fraud and misrepresentation and breach of contract.

### I. Fraud and Misrepresentation

Defendants claim that the trial court erred in granting judgment in favor of the Chesuses, the Cantrells, and the Rohovits on their claims for fraud and misrepresentation. They contend that the representations made to these individuals, according to the evidence presented at trial, could not be classified as statements of existing fact, but rather, as statements of intent as to future conduct. In Missouri, a representation is not fraudulent unless it is a false statement of existing fact, and not a statement of one's opinion, expectations, or predictions for the future. *Slone v. Purina Mills, Inc.,* 927 S.W.2d 358, 372 (Mo.App. W.D.1996). An unkept promise does not, by itself, constitute fraud. *Essig v. Essig,* 921 S.W.2d 664, 666 (Mo.App. W.D.1996). However, "a promise accompanied by a present intent not to perform is a misrepresentation of present state of mind, itself an existing fact, sufficient to constitute actionable fraud." *Sofka v. Thal,* 662 S.W.2d 502, 507 (Mo. banc 1983). Therefore, if a plaintiff alleges fraud based upon a promise or a statement of intent, then the plaintiff must prove that the speaker made the statement intending not to perform. "A failure to perform alone, however, is not sufficient to establish the intent of the promisor at the time the agreement was made. The mere giving of a promise, though breached the next day, does not give rise to an action for tortious fraud." *Carlund Corp. v. Crown Center Redevelopment Corp.,* 910 S.W.2d 273, 279–280 (Mo. App. W.D.1995) (citations omitted).

In reviewing the record, it is apparent that the Wattses have done an extremely poor job of developing and maintaining the Cedar Creek subdivision. The road is poorly constructed, the sewer system stinks, and the common areas are full of weeds, to name just a few of the problems. The record is full of testimony about all of the various eyesores and problems to be found in Cedar Creek. However, in reviewing these allegations of fraud, the focus must be on the representations made to each individual plaintiff that could have induced them to purchase their lots. The record shows that the Wattses made representations concerning both future events and existing facts, and I have divided the discussion accordingly.

#### A. Representations Concerning Future Events

The record reveals that, with the two possible exceptions discussed below, every single representation alleged to have been made by the Wattses was made in the context of a future event.

A significant number of the alleged misrepresentations came from a sales brochure

entitled "What is Cedar Creek?" Edward Chesus, Janice Cantrell, and Larry Rohovit each testified that they received this brochure during an open house in May, 1984. They refer specifically to language such as the following:

> Cedar Creek is a planned, single family development placed on a rocky bluff overlooking the creek from which it draws its name. . . . More than anything else, Cedar Creek is its land . . . . its stream and brooks, its rocks, its maples, oaks and evergreens, its rolling hills, its waterfalls.

> Cedar Creek is also Dennis and Roxy Watts, and Frank Brown, and Dick Carlisle, and Roy and Evelyn Benner—people who needed and designed an environmental buffer.

> As with the houses Dennis builds, Cedar Creek is a handcrafted place. Its rugged beauty has been preserved with utilities (water and electricity) underground, split rail fencing, a private country lane, nature trails, and streamside picnic areas which are all clearly a part of their natural setting. . . .

> . . . All lots in Cedar Creek have access to ten acres of open space (title to these areas will be held by the Cedar Creek Homes Association, the management corporation to be owned by lot owners). This space is being preserved for picnic areas, nature trails, wildlife habitat and similar uses.

Plaintiffs argue that the representations made in this brochure are statements of fact because they are worded in the present tense. I disagree. At the time they received the brochure, it would have been obvious that the Wattses had barely begun to develop Cedar Creek. The open house was held in a newly-constructed home located on lot number three. Except for this house, the subdivision was essentially vacant and undeveloped. No type of permanent road had been constructed. The people who attended the open house had to drive along a gravel road to get to it. The Cantrells had visited Cedar Creek two other times during the weeks preceding the open house. During their first visit, the ground was so muddy

they decided to come back another time so they could have a better look around.

Mr. Chesus testified that on the day of the open house they walked back to look at some of the lots. He also testified that it was a little difficult to see because of leaves and undergrowth. Mr. Chesus's testimony about the brochure was in response to this question: "[W]ould you recite for the Court any representations [the brochure] makes with regard to how Cedar Creek *was going to be developed* that have not come to fruition?" (emphasis added).

The Rohovits visited Cedar Creek several times before they purchased their lot, including several visits in March and April of 1984. During these visits they would walk around and ask questions. During one such visit in April, 1984, Mr. Watts told the Rohovits that Tract A would feature amenities such as picnic areas and hiking trails. He also mentioned that he was putting together a handout that would describe the layout of the lots and the amenities that would be available.

Under the circumstances, it would be unreasonable to think that any of the plaintiffs read the brochure with the impression that the amenities discussed in it were anything other than improvements that the Wattses intended to construct in the future. "The meaning of representations, their truth or falsity, are to be made 'in the light of the meaning which the plaintiffs would reasonably attach to them in existing circumstances and the words employed must be considered against the background and in the context in which they were used.'" *Haberstick v. Gordon A. Gundaker Real Estate Co.*, 921 S.W.2d 104, 109 (Mo.App. E.D.1996) (quoting *Toenjes v. L.J. McNeary Construction Company*, 406 S.W.2d 101, 105 (Mo.App.1966)). It can be concluded, therefore, that the brochure, "What is Cedar Creek," did not contain representations of existing fact. Rather, the brochure contained statements of expectations for the future.

In addition to the testimony about the "What is Cedar Creek" brochure, the individual plaintiffs testified about oral representations made to them by the Wattses. Again, with the two possible exceptions, all of the testimony concerns statements made by the

Wattses about things they planned to do in the future. For example, Mr. Chesus testified that Dennis Watts told him that "Tract B *would be* another common area with access, and it *would consist* primarily of nature trails and things of that nature," and that "there *would be* a waterfall." (emphasis added).

Similarly, Mrs. Cantrell testified, "We were told that there *would be* some kind of sewer, not a sewer system, but berms and things put in to make for storm drainage; that it *was going to look* like a country lane coming through ...." (emphasis added). She also talked about how Dennis Watts told them that he "was considering building a covered bridge."

Mr. Rohovit also testified about improvements that the Wattses said they were planning to complete in the future. "[Mr. Watts] said that [Tract A] would be a common area and there would be picnic areas and hiking trails, jogging trails, those kinds of things." "We were walking down this hill and he says, 'and the road's going to come right through here, and right here is where the millpond is going to be, and there's going to be a covered bridge, and there's going to be a waterfall off to the right,' and boy, I got excited."

The record contains abundant evidence of representations made by the Wattses to Plaintiffs about their development plans. There is no question that these statements were made. The issue now is whether there is evidence that the Wattses made the representations intending not to perform. I find no such evidence, other than testimony that the Wattses failed to perform. Such evidence is not enough to prove the necessary intent. *Carlund Corp.*, 910 S.W.2d at 279–280. Therefore, with respect to the aforementioned representations, I would hold that the evidence does not support the trial court's judgment.

## B. Representations of Existing Fact

The only representations that were not promises or statements of intent concerned discussions about whether some of the properties had passed percolation tests. Initially, the Wattses planned to have homeowners use septic tanks instead of sewers. The City of Lee's Summit would not issue permits to install septic tanks unless the property passed a ground percolation test. Mr. Chesus and Mrs. Cantrell both testified that before they purchased their lots, the Wattses represented to them that their properties had passed ground percolation tests.

Clearly, these would have been statements of existing fact. However, even with regard to these statements, the record provides no evidence of fraud. To successfully prove fraudulent misrepresentation, a plaintiff must establish, among other elements, that the speaker made a false representation, and that the representation was made either with knowledge of its falsity or ignorance of its truth. *Link v. Kroenke*, 909 S.W.2d 740, 746 (Mo.App. W.D.1995). In this case, although the record contains evidence that the properties in question did not pass the percolation test, there is no evidence that the Wattses either knew this or were ignorant of this fact. In fact, Mr. Chesus's testimony suggests that the Wattses made the representations in good faith. He read excerpts from minutes taken at various meetings of the Lee's Summit Planning Commission. First, he read the following from the July 25, 1983 meeting:

In response to another question from Mr. Gloor, Mr. Watts stated that on-site septic systems will be used. He stated that Mr. Formeyer [sic] had conducted percolation tests and more tests will be taken. He stated the results of the percolation tests were good.

Mr. Chesus then read from the minutes of an August 22, 1983 meeting:

Mr. Fahrmeier stated percolation tests have been conducted and it was found that soil absorption systems will be adequate.

Based upon these minutes, it appears that at some point percolation tests had been conducted, and the soil had been deemed adequate for septic tanks. Thus, the Wattses had some basis for making the statements. Chesus also read from correspondence, dated October, 1983, between the City of Lee's Summit and the Superintendent of Inspections. This correspondence suggests that the previously conducted percolation tests were inaccurate, and that the properties

would not support septic tank systems after all. However, there is no evidence tying the Wattses to this information, and it is therefore impossible to tell whether they knew this at the time they spoke to the Chesuses or the Cantrells. "All doubt should be entertained in favor of good faith in determining whether a statement constitutes a misrepresentation." *Stewart v. Kirkland*, 929 S.W.2d 321, 322–323 (Mo.App. S.D.1996) (quoting *Grosser v. Kandel–Iken Builders, Inc.*, 647 S.W.2d 911, 914 (Mo.App.1983)). Therefore, I believe the evidence does not prove that the statements concerning the percolation tests were fraudulently made.

In sum, I would reverse the trial court's judgment in favor of the Chesuses, the Cantrells, and the Rohovits on their claims for fraud and misrepresentation. In regard to the representations concerning future events, the evidence does not support a finding that at the time the Wattses made such representations they intended not to perform. As to statements of existing fact, there is insufficient evidence to prove that the Wattses made these statements with knowledge of their falsity or ignorance of their truth.

## II. Breach of Contract—Cedar Creek Homes Association

The trial court awarded CCHA compensatory damages of $235,000 for breach of contract under Count III of the petition. This amount represented the estimated cost of correcting storm drainage deficiencies, reconstructing the sewer system, and developing the common areas with foot paths, a foot bridge, and other miscellaneous improvements.

The Wattses contend that the trial court erred in granting judgment to CCHA for three reasons: (1) CCHA presented no evidence on its own behalf to support its claim; (2) the petition fails to allege a contract; and (3) no evidence was presented to prove the terms or even the existence of any contract with CCHA. I agree with Appellants as to the second and third arguments.

Count III of Plaintiffs' petition does not sufficiently allege a contract. The relevant paragraphs of Count III read as follows:

24. Watts represented, agreed and promised Plaintiffs to develop a first-class residential area with sewers, streets, walks, utilities, common areas and amenities provided and paid for by Watts.

25. It was expressed or implied that the development would conform to and be done in accordance with generally accepted engineering practices as well as applicable regulations, laws and ordinances for sewers, utilities, subdivisions and regulated land use as represented to Plaintiffs and outlined in written sales and promotional materials Watts supplied to Plaintiffs in connection with sale and purchase of lots and residences in Cedar Creek.

26. Defendants have failed to fulfill their promises, obligations and representations so that the Plaintiffs are damaged by diminished value of their land and improvements and the costs they have been or will be required to pay in connection with corrections, changes, construction and repairs necessitated by the breach of Watts' contractual duties and obligations to Plaintiffs.

To state a cause of action for breach of contract, a plaintiff must plead (1) an agreement between parties capable of contracting; (2) mutual obligations arising under the agreement in respect to a definite subject matter; (3) valid consideration; (4) part performance by one of the parties and the prevention of further performance by the other; (5) and damages measured by the contract resulting from its breach. *Yoest v. Farm Credit Bank of St. Louis*, 832 S.W.2d 325, 329 (Mo.App. W.D.1992) (citing *Berra v. Papin Builders, Inc.*, 706 S.W.2d 70, 73–74 (Mo. App.1986)). Regarding CCHA, the petition falls short in several respects. It does not allege any specific agreement, mutual obligations, or valid consideration. The petition does refer to "sales and promotional materials," presumably meaning the "What is Cedar Creek" brochure. However, upon examining the brochure I find no evidence of a contract between the Wattses and CCHA.

CCHA responds by arguing that the trial court did not err because the "Declaration of Covenants, Conditions, and Restrictions," which was admitted into evidence by stipulation of the parties, constitutes a valid contract, thereby entitling CCHA to the relief awarded to it. CCHA refers specifically to the following language found in the preamble:

> This Declaration shall be construed so as to ensure that Cedar Creek will always be maintained as an attractive, prestigious development for single-family residential homes with ample, landscaped open areas; attractive structures of the highest quality; in order to protect against depreciation in value of the Properties; to provide a quiet place of fields and forests where homes are designed with nature in mind.

CCHA claims that this language and the Declaration read as a whole "necessarily imply and mandate that the development's construction would conform to generally accepted engineering practices and conform to applicable regulations, laws, and ordinances, including those regarding sewers and utilities." I would reject this argument for two reasons. First, the petition makes no reference whatsoever to the Declaration. CCHA's argument, therefore, does not change the fact that it failed to adequately plead the existence of a contract. Second, I find no evidence in the Declaration or anywhere else in the record to suggest that the Declaration contractually obligates the Wattses to perform in the manner advanced by CCHA. The Declaration establishes the rights and duties of CCHA, lists membership requirements, and sets out certain restrictions on the use of the individual parcels and common areas so as to maintain a common scheme throughout the subdivision. There are, however, no provisions defining the manner in which the Wattses, as the developers, are to construct roads, the drainage and sewer systems, or the common area improvements. I have no doubt that the Wattses have violated numerous construction codes and ordinances, but Plaintiffs have not properly alleged, nor does the evidence prove, that a contract exists between CCHA and the Wattses.

## III. Breach of Contract—The Raups

The Wattses also contest the trial court's grant of judgment in favor of the Raups for breach of contract. They argue that there was no competent and substantial evidence to support the judgment because the Raups had no privity of contract with them. The Raups present no response.

William Raup testified at trial that they purchased their lot, number eleven, sometime around late 1986 or early 1987 for $60,000. The Raups did not purchase their lot from the Wattses. Rather, they purchased it from a third party named Smith. The record shows little evidence of any contact between the Raups and the Wattses. Most of Raup's testimony was in regard to a dispute he had with Dennis Watts about connecting to his sewer system. I find no evidence of a contract, and therefore would reverse the trial court's judgment for that reason.