

# SUPREME COURT OF MISSOURI
## en banc

MILLSTONE PROPERTY OWNERS ASSOCIATION, )
)
Respondent/Cross-Appellant, )
)
v. )
)
NITHYANANDA DHYANAPEETAM OF ST. LOUIS, )
)
Appellant/Cross-Respondent, )
)
FOGARTY FARMS, )
)
Respondent/Cross-Appellant. )

*Opinion issued December 10, 2024*

No. SC100574

**APPEAL FROM THE CIRCUIT COURT OF JEFFERSON COUNTY**
**The Honorable Victor J. Melenbrink, Judge**

This appeal concerns a tract of land that was platted into a subdivision designed for single-family residential use. The subdivision's original owner recorded restrictions on the land. A subsequent purchaser acquired the subdivision in its entirety and attempted to develop the land in a manner at odds with the restrictions, including building a structure not intended for residential use. When the subsequent purchaser's plans proved unsuccessful, a few lots, including the lot with the structure, were transferred to one organization. The remaining subdivision lots were sold to another entity. This latter entity

also received an assignment of developer rights from the subsequent purchaser, despite no express transfer of those rights from the subdivision's original owner. This appeal focuses on whether developer rights transferred from the subdivision's original owner and whether the subdivision's restrictions were abandoned.

After a bench trial, the circuit court found the original owner transferred developer rights and held the restrictions were not abandoned. With the restrictions in place, the circuit court determined a property owners association created pursuant to the restrictions was proper and the organization owning the few lots was required to act in accordance with the restrictions. The circuit court further invalidated a challenged transfer of common ground. Following a provision in the restrictions, the circuit court awarded reasonable attorney fees to the property owners association. This Court affirms the circuit court's judgment in all respects.

**Factual and Procedural Background**

In May 2004, Essex Development Inc. executed and recorded restrictions for a tract of land in Jefferson County known as Millstone Subdivision ("the subdivision"). The stated purpose of the restrictions was to preserve the land "as a respectable and attractive residential neighborhood." In pursuit of that purpose, the restrictions established governance for the subdivision, outlined a process for levying assessments, set forth a list of restrictions applicable to lots, and provided for enforcement of the restrictions. The lots in the subdivision were expressly "restricted to single family residence usage only." As to enforcement of the covenants, the restrictions stated "[f]ailure or forbearance to enforce any covenant or restriction shall not be deemed a waiver of the right to do so thereafter."

2

Another restriction discussing severability provided: "Nor shall the failure to enforce a covenant or agreement herein act as a waiver or prohibit the enforcement of same in the future."

The restrictions discussed certain rights of Essex or the owner of the subdivision. The restrictions declared:

> Owner shall have the right to assign all or a portion of its powers and responsibilities under these Restrictions to a subsequent purchaser or developer of unsold lots of the subdivision as Owner sees fit. After said assignment, the assignee purchaser or developer shall have all the powers and responsibilities of Owner under these Restrictions subject to any limitations set forth in said assignment by Owner.

Additionally, Essex or its "successors or assigns" had a broad power to amend the restrictions while they retained ownership of any lot in the subdivision. Any such amendments had to be recorded.

The subdivision's first phase, as reflected on a recorded plat, consisted of 21 numbered lots. An unnumbered lot on the plat containing a lake was labeled as common ground.[1] The plat noted "[t]he common ground area as shown hereon shall remain with and be maintained by all present and future lot owners of [the subdivision] and all future plats of [the subdivision]." Under the restrictions, delineated common areas were to be used "for the benefit of the lot owners of the Subdivision" and common areas had to "be transferred by deed of conveyance from Owner to the Millstone Property Owners

---

[1] The circuit court's judgment and testimony at trial referred to a total of 24 lots. The discrepancy is irrelevant to this appeal.

3

Association to be created as set forth below at such time as Owner deems proper and in the sole discretion of Owner."

In October 2007, Essex transferred the entire subdivision to Ananda LLC by general warranty deed. The general warranty deed contained a habendum clause[2] providing: "TO HAVE AND TO HOLD the same, together with all rights and appurtenances to the same belonging, unto [Ananda], and to the heirs and assigns of such party(ies) forever." Essex did not execute a separate assignment of its developer rights in the subdivision. Contemporaneously with transferring of the subdivision to Ananda, Essex liquidated its interest in surrounding real estate. Since transferring the subdivision, Essex has taken no action whatsoever with respect to the property.

Ananda initiated a plan to transform the land within the subdivision into a mixed-use development to be known as Ananda Temple. The proposed development was to include a community center/temple, an educational center, and housing to consist of single-family homes, condominiums, and townhouses. Ananda submitted plans to the Jefferson County planning division in an attempt to rezone the property to allow the development to move forward. The plans ultimately failed.

While Ananda was pursuing its plans for Ananda Temple, it constructed a utility building to house carved stone deities on one of the subdivision's lots. In December 2008,

---

[2] A habendum clause is used to explain, qualify, or define the interest granted in a deed. *Tennison v. Walker*, 190 S.W. 9, 13 (Mo. 1916); *see also Habendum Clause*, *Black's Law Dictionary* (12th ed. 2024) (defining "habendum clause" as "[t]he part of an instrument, such as a deed or will, that defines the extent of the interest being granted and any conditions affecting the grant" and explaining "[t]he introductory words to the clause are ordinarily *to have and to hold*").

Ananda transferred the lot containing the utility building and two adjacent lots to Nithyananda Dhyanapeetam of St. Louis ("Nithyananda") by quit claim deed. Nithyananda members visited the carved stone deities daily until sometime in 2016 and used the lake lot, which was adjacent to Nithyananda's lots, for spiritual purposes.

In October 2015, Ananda transferred the remaining subdivision lots to Fogarty Farms LLC by general warranty deed. At the same time, Ananda executed an "Assignment of Developer Rights" to Fogarty Farms. Pursuant to the restrictions, Fogarty Farms then incorporated the Millstone Property Owners Association ("the association"). The association was tasked with maintaining the subdivision's streets and common areas and enforcing the restrictions. A board of directors managed the association and, among other duties, possessed the power to levy assessments.

In June 2016, Fogarty Farms adopted a "First Amendment to Millstone Subdivision Restrictions." The amendment purported to remove the lake lot as common ground to make it available for use as a saleable lot. The amendment also changed restrictions applicable to lots. In May 2017, the association deeded the lake lot to Fogarty Farms.

In June 2017, the association sued Nithyananda. The association alleged breach of the restrictions for failure to pay assessments and failure to maintain the three lots. The association sought foreclosure of the related liens. Nithyananda filed a counterclaim for declaratory relief, claiming Fogarty Farms had no valid assignment of developer rights from Essex and, consequently, had no authority to establish a board of directors capable of levying an assessment. Nithyananda also argued the circuit court should set aside the

5

transfer of the lake lot to Fogarty Farms and joined Fogarty Farms as a defendant to the litigation.

Following a two-day bench trial in April 2021, the circuit court held, as relevant to this appeal: (1) Fogarty Farms lawfully possessed the subdivision's developer rights; (2) the subdivision's restrictions had not been abandoned; (3) Nithyananda had to comply with the restrictions, including all assessments and lot maintenance requirements;[3] and (4) the lake lot remained common ground. The circuit court ordered Nithyananda to pay the association $50,000 in attorney fees and costs.

Nithyananda appeals, and the association and Fogarty Farms cross-appeal.[4]

## Standard of Review

"An appellate court must sustain the decree or judgment of the [circuit] court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Furlong Cos., Inc. v. City of Kan. City*, 189 S.W.3d 157, 168 (Mo. banc 2006) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)).

---

[3] Before the circuit court, Nithyananda posited the first amendment protected its use of the property for religious practices. The circuit court found the residential-use requirement was not aimed at any specific faith. Nithyananda does not appeal this determination. To the extent portions of Nithyananda's argument attack the restrictions by claiming the restrictions limit Nithyananda's practice of religion, those arguments are not preserved. *Faatz v. Ashcroft*, 685 S.W.3d 388, 401 (Mo. banc 2024) (noting arguments raised in briefing that are omitted from the point relied on are not preserved for appellate review).

[4] After an opinion by the court of appeals, this Court granted transfer. Mo. Const. art. V, sec. 10.

**Analysis**

Nithyananda brings three points on appeal. First, Nithyananda argues the circuit court erred in ruling Essex transferred developer rights to Ananda. Second, Nithyananda claims the circuit court erred in finding the restrictions were not abandoned. Finally, if successful under either previous point, Nithyananda maintains the circuit court erred in awarding the association attorney fees and back-due assessments.[5] The association and Fogarty Farms bring two points in their cross-appeal. First, they contend the circuit court erred in determining the lake lot remained common ground. Second, the association argues the circuit court erred in not awarding the full amount of requested attorney fees.

**The circuit court did not err in determining Essex transferred developer rights**

Nithyananda argues Ananda never received developer rights from Essex. While there is no dispute documentation exists purporting to transfer developer rights from Ananda to Fogarty Farms, Nithyananda focuses on the lack of an express transfer of

---

[5] Each of Nithyananda's three points relied on alleges error on the basis the circuit court's holding was (1) against the weight of the evidence and (2) misapplied the law. Asserting these two *Murphy* grounds in a single point is not appropriate. *Ivie v. Smith*, 439 S.W.3d 189, 199 n.11 (Mo. banc 2014). Responding to the first two points, the association and Fogarty Farms nominally address yet a different *Murphy* ground and posit there was substantial and competent evidence to support the circuit court's holding. Parsing the argument of each of Nithyananda's points, it appears Nithyananda actually makes against-the-weight-of-the-evidence arguments. Its first point ultimately focuses on the facts of this case and attacks the circuit court's determination about what the totality of the circumstances demonstrated. Its second point focuses on competing facts presented to the circuit court concerning abandonment. The third point likewise turns on the factual determinations of the first two points. The association and Fogarty Farms respond with arguments about what the evidence adduced at trial indicated.

7

developer rights between Essex and Ananda. Nithyananda similarly argues the evidence adduced at trial demonstrated Ananda did not have the intent to receive developer rights.

"In general, 'developer rights' are the rights of a subdivision developer to declare covenants for a subdivision that regulate the relationship of the real estate developer to its subdivision, as well as the purchasers of property." *State ex rel. AJKJ, Inc. v. Hellmann*, 574 S.W.3d 239, 241 n.1 (Mo. banc 2019) (alteration omitted) (internal quotation omitted). "[T]he developer's rights of a platted subdivision are personal rights that do not run with the land." *Scott v. Ranch Roy-L, Inc.*, 182 S.W.3d 627, 633 (Mo. App. 2005) ("*Scott I*"). Developer rights may be assigned in combination with the transfer of real estate, but the owner of the developer rights must manifest an intent to transfer the developer rights, not merely the title to the real estate. *Woodglen Estates Ass'n v. Dulaney*, 359 S.W.3d 508, 513 (Mo. App. 2012).

To effectuate an assignment, "[t]he intent to assign an interest is key." *Scott I*, 182 S.W.3d at 634. That intent to assign can be demonstrated when "circumstances show an intent on one side to assign and on the other side to receive." *Id.* Without a specific assignment of developer rights in a warranty deed, a deed's generic habendum clause is insufficient to convey developer rights. *Id.* at 633. The habendum clause, however, can serve as evidence of intent to convey developer rights. *Scott v. Ranch Roy-L, Inc.*, 242 S.W.3d 401, 406 (Mo. App. 2007) ("*Scott II*").

This Court agrees with the circuit court's determination that the totality of the circumstances demonstrated Essex intended to transfer developer rights to Ananda. The language in the habendum clause, though not determinative alone, provided evidence of

8

Essex's intent to transfer developer rights when considered in conjunction with other circumstances showing intent of the parties to transfer those rights. *See id.* Essex deeded all of its interest in the subdivision, including "all rights," to Ananda, and Essex further liquidated its entire property interest in the area at the same time. During the time Ananda held title to the property, and while Ananda was publicly conceptualizing plans to turn the property into Ananda Temple, neither Essex nor anyone acting on its behalf took any action whatsoever with respect to the tract of land. The circumstances show Essex relinquished its developer rights to the purchaser of the subdivision in its entirety.

Ananda demonstrated an intent to receive the assignment of developer rights. In its planning for Ananda Temple, Ananda proposed a plan for the subdivision that would not have been permissible had Essex retained developer rights. Had Ananda believed Essex retained developer rights, it would not have been able to effectuate its plans in derogation of the restrictions. Nithyananda also fails to address how Ananda's subsequent execution of its assignment of developer rights to Fogarty Farms does not serve as strong evidence that Ananda believed Essex assigned it developer rights. Ananda's conduct demonstrates it intended to receive and did receive all rights to the subdivision from Essex. Evidence supports the circuit court's holding regarding the transfer of developer rights.

**The circuit court did not err in determining the restrictions remain in force**

Nithyananda argues Ananda and Fogarty Farms both took actions resulting in total abandonment of the restrictions. Nithyananda references Ananda's actions in attempting to transform the subdivision into a religious and educational center, including the acquisition of the stone deities and construction of the utility building to house them, which

9

were contrary to the restrictions. Nithyananda argues Fogarty Farms also abandoned the restrictions by amending the restrictions, using the property for non-residential use, failing to enforce the restrictions, and failing to expediently develop the property.

While free use of real property is favored, the courts will respect valid restrictions imposed on real property. *Dierberg v. Wills*, 700 S.W.2d 461, 466 (Mo. App. 1985). "The right to enforce a valid restrictive covenant may, however, be waived by conscious acquiescence in persistent, obvious and widespread violations thereof." *Id.* Determination of waiver or abandonment is not subject to "hard and fast rules," and a court must look to the circumstances of each case to ascertain whether a covenant can no longer be enforced. *Id.* at 465-66.

> If restrictions apply to an entire area and redound to the benefit of all property owners in the restricted area, then waiver or abandonment occurs only when violations of the restrictions are so general as to indicate an intention or purpose to abandon the plan or scheme intended to be maintained by the restrictions.

*Id.* at 466.

Under the circumstances, this Court finds Ananda did not abandon the restrictions. At best, Nithyananda has shown Ananda *attempted* to enact a different plan for the subdivision. That plan proved unsuccessful, and Ananda then sold its interest prior to enacting widespread changes. Notably, Ananda, in possession of the developer rights, could have recorded an amendment to the restrictions to alter the scheme Essex put into place. Ananda did not. While Ananda caused the utility building to be constructed on a lot Nithyananda now owns, this singular deviation from the restrictions is far from being "so general as to indicate an intention or purpose to abandon the plan or scheme intended

10

to be maintained by the restrictions." *See id.* The overall scheme intended under the restrictions—preservation of the land as a single-family residential neighborhood—continued to exist despite the presence of the non-conforming use on one lot. Every other lot in the subdivision ultimately remained unaffected by Ananda's conceptual plans. No wide-ranging violations of the restrictions, which would suggest abandonment of the restrictions or waiver of the ability to enforce the restrictions, occurred.

The evidence likewise does not reveal Fogarty Farms abandoned the restrictions. Nithyananda first points to an amendment Fogarty Farms made to the restrictions to remove a prohibition on hunting. Under the amended provision, hunting on an owner's lot is permissible with the board of directors' prior approval. Although Nithyananda argues this amendment is incompatible with single-family residential usage, Nithyananda merely speculates the size of the lots and control of the activity by the board of directors would result in incompatibility with residential usage. Nithyananda's theory as to why this single amendment would result in abandonment of the restrictions in toto is unclear.

Nithyananda also claims the property was used for commercial activity to such an extent as to show an intent to abandon the restrictions. In support, Nithyananda points to occasions in which Bill Fogarty's company[6] held events within the subdivision. Assuming these events violated the restrictions' residential usage requirement, the sporadic nature of the events, again, does not show "persistent, obvious and widespread violations" of the

---

[6] Bill Fogarty is a member of Fogarty Farms and president of the association's board of directors. Nithyananda alleged corporate events on behalf of Fogarty Services, another company owned by Fogarty, were held on lots within the subdivision.

restrictions. *See id.* Nithyananda did not avail itself of the option to attempt to enforce the restrictions to prevent activities it found to be out of compliance.

Nithyananda next complains Fogarty Farms has been dilatory in developing the property. The restrictions, however, do not place a burden on the developer to develop the lots within any definite timeframe. Moreover, testimony showed Fogarty Farms' hesitancy to market the lots given Nithyananda's contention that developer rights were never transferred. Fogarty Farms' decision not to actively market lots for sale does not amount to an act of abandonment. The lots remain in a state compatible with future single-family residential usage.

Lastly, Nithyananda complains about the construction of a large entrance gate bearing the name "Fogarty Farms." According to Nithyananda, this stands as the strongest evidence of Fogarty Farms' intent to abandon the restrictions. This Court was not directed to any provision in the restrictions, and it finds none, that would prohibit the board of directors from branding the subdivision as it sees fit. Additionally, this single act, which Nithyananda never challenged as violating the restrictions, does not impact the restrictions' underlying purposes. The record supports the conclusion Fogarty Farms did not abandon the restrictions.

This Court further finds the circuit court correctly recognized the restrictions themselves established non-enforcement of any provision would not result in waiver. The subdivision's restrictions constitute "a private contractual obligation generally governed by the same rules of construction applicable to any covenant or contract." *Trs. of Clayton Terrace Subdivision v. 6 Clayton Terrace, LLC*, 585 S.W.3d 269, 280 (Mo. banc 2019). In

12

the absence of ambiguity, intent is derived from the contract's language alone, and courts will give effect to that intent. *Id.* Here, the restrictions plainly provide "[f]ailure or forbearance to enforce any covenant or restriction shall not be deemed a waiver of the right to do so thereafter", "[n]or shall the failure to enforce a covenant or agreement herein act as a waiver or prohibit the enforcement of same in the future."

Nithyananda argues Ananda's and Fogarty Farms' failures to follow or enforce the restrictions resulted in the restrictions' abandonment. But the plain language of the restrictions prevents this. While Ananda may have gone to great lengths to allow the construction of the utility building and permitted its use for non-residential purposes, the restrictions expressly preserve the right to require compliance in the future. To the extent the association Fogarty Farms established has failed to enforce any covenants, the restrictions, again, preserve a right to enforcement regardless. Nithyananda took its lots subject to the restrictions and, pursuant to those restrictions, subject to their enforcement in the future, even when certain provisions may not have been strictly enforced in the past.

**The circuit court did not err in finding the lake lot remains common ground**

In their cross-appeal, the association and Fogarty Farms allege the circuit court erred in voiding the transfer of the lake lot from the association to Fogarty Farms. The circuit court found the transfer would be unjust given Nithyananda's reliance on the representation the lake lot existed as common ground. The association and Fogarty Farms point to the language of the restrictions requiring a deed of conveyance of the common areas to the association and also argue, if the lake lot was ever common ground, the amendment provision permitted its removal from the subdivision's common ground. Alternatively, the

association and Fogarty Farms posit the association had the authority to transfer the lake lot due to necessary circumstances. These arguments are unpersuasive.

The association and Fogarty Farms essentially ask this Court to permit the removal of space shown as common ground in a platted subdivision after lots adjacent to the common ground are no longer in the developer's possession. Estoppel is available as a remedy to prevent a developer from altering the character of common ground within a subdivision when lot owners have relied upon a subdivision plat showing areas to be preserved as common ground.[7] *Chesus v. Watts*, 967 S.W.2d 97, 108-09 (Mo. App. 1998). The following elements must be established to support a claim for promissory estoppel: "(1) a promise; (2) promisee detrimentally relies on the promise; (3) promisor could reasonably foresee the precise action the promisee took in reliance; and (4) injustice can only be avoided by enforcement of the promise." *Id.* at 107.

This Court affirms the circuit court's holding that it would be unjust to remove the lake lot from the subdivision's common ground. When Ananda deeded the three lots adjacent to the lake lot to Nithyananda in 2008, it is apparent both were contemplating a temple complex in which a body of water was necessary. Ananda deeded the lots to Nithyananda with reference to the subdivision's plat, which proclaimed "[t]he common

---

[7] Although the association and Fogarty Farms reference the deed from the association to Fogarty Farms purporting to convey the lake lot, the record is not clear as to the association's interest in the lake lot at that time. While the association and Fogarty Farms argue a deed of conveyance to the common areas is required to create the common areas, there is no deed in the record indicating Fogarty Farms, as the developer, transferred the lake lot to the association such that the association could transfer the lake lot back to Fogarty Farms. Putting this uncertainty aside, the broader question addressed here is whether the lake lot remains common ground.

ground area as shown hereon shall remain with and be maintained by all present and future lot owners of [the subdivision] and all future plats of [the subdivision]." The associated restrictions required delineated common areas to be used "for the benefit of the lot owners of the Subdivision." This constitutes a promise. Testimony at trial showed Nithyananda relied upon access to the lake lot and the lake itself held religious significance to Nithyananda's members. Presumably, Nithyananda selected the lots due to the lake's proximity and the ability to use the area. Nithyananda demonstrated detrimental reliance on the promise. The association and Fogarty Farms argue such reliance was unreasonable given the restrictions required common areas to be transferred by a deed of conveyance and the developer reserved amendment power. This Court disagrees: when lot owners were "sold on the promise" of certain common ground based on a subdivision plat, it is contrary to public policy to permit a developer to unilaterally alter the character of that common ground, even if the developer retains such authority through covenants. *Id.* at 108-09. It was foreseeable Ananda would expect Nithyananda to have access to the lake lot given the parties' intentions to turn the subdivision into a temple complex. At this point, after continued access to the lake lot since 2008, it would be unjust to strip Nithyananda of access to what was originally deemed common ground of the subdivision. Under the applicable standard of review and the rather unique circumstances of this case, this Court sees no reason to overturn the circuit court's judgment.

The alternative argument that the association had the authority to transfer the lake lot due to necessary circumstances also fails. According to the association and Fogarty Farms, the lake and dam were in poor repair and the association lacked sufficient funds to

make necessary repairs or to insure the lake lot.  Following this argument, transfer of the lake lot was supposedly appropriate.  This Court agrees with the circuit court's assessment that, assuming Nithyananda pays the back assessments owed on its lots, those assessments—combined with the support of Fogarty Farms, as the subdivision's developer—will be sufficient to maintain the subdivision's common areas during the development and sales period for the subdivision lots.  Current shortfalls in the association's funds are due, in part, to delays by Ananda and Fogarty Farms in developing the subdivision.  While Fogarty Farms, as an assign of Essex, is exempt from assessments per the restrictions, the exemption logically exists in recognition of the reasonable development and maintenance costs associated with being the developer.  Under these circumstances, Fogarty Farms is not entitled to remove the lake lot from the subdivision's common ground.

### The circuit court did not err in its award of attorney fees

Nithyananda contends, because developer rights were not transferred or were subsequently abandoned, the circuit court erred in awarding the association attorney fees and back-due assessments.  Because this Court has rejected Nithyananda's contentions, an award of attorney fees and back-due assessments is appropriate.

When contracts allow for attorney "fees and expenses incurred in the enforcement of a contract provision, the trial court must comply with the terms of the contract and award them to the prevailing party." *WingHaven Residential Owners Ass'n, Inc. v. Bridges*, 457 S.W.3d 383, 385 (Mo. App. 2015).  In enforcing assessments, the subdivision restrictions state "costs incurred on account of such non-payment, including attorney[] fees … shall

16

constitute a lien upon said lot which shall remain in effect until said amount is fully paid." The plain terms of the restrictions also permit the party enforcing the restrictions "to recover their expenses in doing so, including without limitation, reasonable attorney[] fees and costs of litigation …." Finally, the restrictions specify that, should an action a lot owner brings against the association fail, the lot owner is liable for attorney fees. Pursuant to these allowances, the association is entitled to reasonable attorney fees and the costs of litigation. The association incurred attorney fees in pursuing assessments, enforcing the restrictions as to the use of the utility building, and successfully defending the claim that the association's board of directors was illegally constituted because Fogarty Farms lacked developer rights.

In its cross-appeal, the association argues the circuit court erred in not awarding it the full amount of requested fees. The circuit court determined "the [a]ssociation is entitled to recover a portion of its attorney[] fees and recoverable costs. The Court finds $50,000 to be a reasonable attorney[] fees award in light of the relevant competing factors."

The circuit court is in the unique position of knowing not only "the character of the services rendered in duration, zeal, and ability" but also "the value of [those services] according to custom, place, and circumstance." *Nelson v. Hotchkiss*, 601 S.W.2d 14, 21 (Mo. banc 1980). This Court reviews the award of attorney fees for an abuse of discretion. *Berry v. Volkswagen Group of Am., Inc.*, 397 S.W.3d 425, 430 (Mo. banc 2013). "To demonstrate an abuse of discretion, the complaining party must show the trial court's decision was against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *Id.* at 431.

17

On the record presented, this Court perceives no abuse of discretion in the circuit court's award to meet that high standard. The circuit court appears to have sensibly resolved a dispute between Nithyananda and the association as to (1) reasonable rates for attorneys and support staff in the area and (2) the quantity of time reasonably necessary to expend on the litigation in light of the complexities of the case. The circuit court made this assessment in the face of arguments by each side claiming unnecessary paths in the litigation. The association fails to demonstrate an abuse of discretion.

### Conclusion

For the reasons set forth above, the circuit court's judgment is affirmed.


_____

Robin Ransom, Judge


All concur.